STATE v. POST. (No. 5202.)

(Court of Civil Appeals of Texas. Austin. June 18, 1913. On Motion for Rehearing, Oct. 22, 1913. Rehearing Denied July 1, 1914.)

On Motion for Rehearing.

1. PUBLIC LANDS (§ 175*)—RESURVEY—CONCLUSIVENESS.

A resurvey of public lands, under Acts 20th Leg. c. 115, authorizing such resurveys, was not conclusive against the state as to the true location of the land owned by plaintiff under a prior grant.

[Ed. Note.—For other cases, see Public Lands, Cent. Dig. §§ 555–570; Dec. Dig. § 175.*]

2. PUBLIC LANDS (§ 175*)—RESURVEY—FIELD NOTES OF PREVIOUS SURVEY—CORRECTION.

Under Rev. St. 1895, arts. 4130–4141, relative to surveys of public lands, where a resurvey of public land is made under Acts 20th Leg. c. 115, authorizing resurveys, the surveyor cannot correct the field notes of the previous survey without having the certificate in his hands, unless such survey was in conflict with land previously appropriated, and then only to the extent of such conflict, nor can he include in the corrected field notes any land not included in the original file or location.

[Ed. Note.—For other cases, see Public Lands, Cent. Dig. §§ 555–570; Dec. Dig. § 175.*]

3. PUBLIC LANDS (§ 175*)—RESURVEY—FIELD NOTES OF PREVIOUS SURVEY—CORRECTION—EFFECT.

Where a state surveyor appointed under Acts 20th Leg. c. 115, surveys patented lands without having the certificate for the same in his hands, the corrected field notes made by him on such resurvey have no force unless the owners of such lands surrender their patents and accept new patents in accordance with the resurvey.

[Ed. Note.—For other cases, see Public Lands, Cent. Dig. §§ 555–570; Dec. Dig. § 175.*]

4. PUBLIC LANDS (§ 175*)—RESURVEY—PATENTED LANDS.

Where the original surveys of public land left an unappropriated space between two grants, the state surveyor appointed under Acts 20th Leg. c. 115, had no authority to extend the original surveys, so as to include such land, where it did not appear that there were any conflicts or material errors, or attempt to correct conflicts or errors in the original surveys.

[Ed. Note.—For other cases, see Public Lands, Cent. Dig. §§ 555–570; Dec. Dig. § 175.*]

5. PUBLIC LANDS (§ 175*)—RESURVEY—CORRECTION OF FIELD NOTES.

Calls for course and distance in the field notes of a resurvey made of public land by the state surveyor appointed under Acts 20th Leg. c. 115, may, in a proper case, be extended and varied to fulfill other calls in its field notes, but not to satisfy the calls in a junior survey.

[Ed. Note.—For other cases, see Public Lands, Cent. Dig. §§ 555–570; Dec. Dig. § 175.*]

6. PUBLIC LANDS (§ 175*)—RESURVEY—FIELD NOTES.

In the absence of natural or artificial marks called for in the field notes, showing error in course or distance, and in the absence of proof as to how surveys were actually made, the lines must on a resurvey by a state surveyor appointed under Acts 20th Leg. c. 115, be run out course and distance from known corners with which they connect by their callings.

[Ed. Note.—For other cases, see Public Lands, Cent. Dig. §§ 555–570; Dec. Dig. § 175.*]

7. PUBLIC LANDS (§ 172*)—COMMISSIONER—AUTHORITY.

A commissioner of the land office has no authority except that conferred on him by law.

[Ed. Note.—For other cases, see Public Lands, Cent. Dig. §§ 523–543; Dec. Dig. § 172.*]

8. PUBLIC LANDS (§ 175*)—RESURVEY—COMMISSIONER OF LAND OFFICE—AUTHORITY.

The power conferred on the commissioner of the land office by Acts 20th Leg. c. 115, to have lands in which the state is interested resurveyed to correct errors in previous surveys, does not authorize him, by proving erroneous surveys, to change the lines and corners of patented surveys, so as to include therein land not included in the field notes of such patented surveys, as originally run and patented.

[Ed. Note.—For other cases, see Public Lands, Cent. Dig. §§ 555–570; Dec. Dig. § 175.*]

9. PUBLIC LANDS (§ 175*)—RESURVEY—DISPOSITION.

Since all public lands in the state were set aside to the school fund by the act of 1900 (Acts 26th Leg. 1st Called Sess. c. 11), a resurvey in 1905 and 1906 of public lands by a state surveyor appointed under Acts 20th Leg. c. 115, so as to include unappropriated lands in a patented survey by extending the lines thereof beyond their original location, constitutes a giving away of such lands in violation of Const. art. 7, § 4, prohibiting the disposition of lands set apart for the public free school fund, except by selling same.

[Ed. Note.—For other cases, see Public Lands, Cent. Dig. §§ 555–570; Dec. Dig. § 175.*]

10. CONSTITUTIONAL LAW (§ 48*)—PRESUMPTIONS AS TO VALIDITY OF STATUTE.

It will not be presumed that the Legislature intended an act to be so construed as to render it unconstitutional.

[Ed. Note.—For other cases, see Constitutional Law, Cent. Dig. § 46; Dec. Dig. § 48.*]

11. EVIDENCE (§ 23*)—JUDICIAL NOTICE—OWNERSHIP—PUBLIC LANDS.

The courts will take judicial notice of the fact that the state was originally the owner of all lands in Texas, not granted by the government of Spain, or Mexico, or the Republic of Texas, prior to the organization of the state.

[Ed. Note.—For other cases, see Evidence, Cent. Dig. §§ 29, 30; Dec. Dig. § 23.*]

12. BOUNDARIES (§ 33*)—EVIDENCE—BURDEN OF PROOF.

He who claims land by virtue of a grant from the state, when the boundaries are in issue, must prove, not only the grant, but the location of such boundaries, and that the land in controversy is included therein.

[Ed. Note.—For other cases, see Boundaries, Cent. Dig. §§ 146–152; Dec. Dig. § 33.*]

Appeal from District Court, Travis County; Geo. Calhoun, Judge.

Action by C. W. Post against J. T. Robinson, as Commissioner of the General Land Office, in which the State intervened. From a judgment for plaintiff, the State appeals. Reversed and rendered on rehearing. Certi-

fied question answered by Supreme Court (169 S. W. 407).

B. F. Looney, Atty. Gen., and G. B. Smed-ley, Asst. Atty. Gen., for the State. Jno. P. Marrs, of Post City, and Gregory, Batts & Brooks, of Austin, for appellee.

JENKINS, J. The following findings of fact and conclusions of law filed by the trial court herein present a fair statement of the nature and result of this suit, and the facts proven:

"This was a suit originally instituted by the plaintiff, C. W. Post, against J. T. Robison, as land commissioner of the state of Texas, and J. E. Ketner and E. D. Duncan, and after the institution of said cause the state of Texas, under leave of the court, intervened in this case and asked for the recovery of certain lands from the plaintiff, claimed to be vacant lands and held by the plaintiff, as set out in the state's plea of intervention filed herein, and for the rental value of said land. And upon the trial of said cause plaintiff in open court dismissed his cause of action as to the defend-ants J. T. Robison, J. E. Ketner, and E. D. Duncan, and the said defendants Ketner and Duncan, in open court, dismiss their cross-ac-tion, filed herein against the plaintiff, leaving the only issue to be tried by the court upon the plea of intervention of the state of Texas against the plaintiff, C. W. Post. Upon the trial of said issue, I rendered a judgment in favor of the plaintiff upon the state of Texas' cross-action.

"The state of Texas, through its Attorney General, has requested that I prepare and file the findings of fact and conclusions of law on which the judgment was predicated. I accord-ingly hereby state said findings of fact and con-clusions of law as follows:

"Findings of Fact.

"That the original field notes of the survey offered in evidence in this case do cover part, but do not cover all, the lands sought to be re-covered by the state under their plea of inter-vention in this case. That the corrected field notes of the resurvey made by W. D. Twitchell under the direction of the commissioner of the general land office, under and by virtue of the act of 1887, fully cover all the lands sought to be recovered by the state in this cause in the plea of intervention. That the said W. D. Twitchell, prior to the survey of the land in controversy in this cause, by him, was duly and legally appointed by the then land com-missioner of the general land office as a state surveyor for the purpose of ascertaining the conflict and errors in, and making proper cor-rections of, surveys of land made for the com-mission (common) school, university, or asylum funds or other surveys in which the state might be interested directly or indirectly. That the said W. D. Twitchell made and executed a bond in the sum of $10,000, conditioned and payable the same as bonds of county and district sur-veyors, and that said bond was duly approved by the then commissioner of the general land office, and that the said Twitchell took the oath prescribed by the Constitution for other officers, and qualified as a state surveyor. That the resurvey of the lands in controversy in this cause by the said W. D. Twitchell was made by the request and upon the application of the owners of the lands. And that the said owners paid all of the expenses incurred in making such corrected surveys of said lands. And that, in making said resurveys of said lands, the said W. D. Twitchell acted under the control and direction of the then commissioner of the general land office, and said survey was made by the said W. D. Twitchell in accordance with and according to the instructions in writing given by the said land commissioner. That, after making said survey as aforesaid, the said W. D. Twitchell returned the field notes of the survey or resurvey as made by him to the general land office, and the said field notes, when so returned to the land office, were adopt-ed and approved by the commissioner of the general land office, and thereafter the land com-missioner forwarded to the surveyor of the county in which said lands so resurveyed by the said Twitchell as aforesaid lay, certified copies of said field notes and said field notes were duly recovered (recorded) as a part of the records of said surveyor's office.

"Conclusions of Law.

"The Act of 1887, p. 107, provides that for the purpose of ascertaining the conflicts and errors in and making proper correction of sur-veys of lands made for the common school, uni-versity, or asylum fund, or other surveys in which the state may be interested, directly or indirectly, in cases where, from discrepancies or imperfections in field notes, it may become necessary for the proper compilation of maps, or for the proper location and identification of said lands upon the ground, the commissioner of the general land office is hereby invested with full power and authority to have such surveys made as he may deem necessary and to appoint competent surveyors for this purpose. And said act further provides that any survey-or appointed under the provisions of this law shall make and execute a bond in the sum of $10,000, conditioned and payable the same as bonds of county and district surveyors; that he shall also take the oath prescribed by the Constitution for other officers, said bond to be approved by the commissioner of the general land office, and shall be conditioned as other surveyors' bonds. It also provides that said surveyor shall be under the control and direc-tion of the commissioner of the general land office, and, under such direction, may survey the common school, university, and asylum lands, or other lands in which the state may be interested, and prepare and return field notes of same and certify to any and all facts and generally do and perform such official acts as might lawfully be done by a county or district surveyor, and shall sign his name officially as 'state surveyor.' Said act also provides that the commissioner of the general land office may have any lands belonging to the common school, university, or asylum fund, or other lands in which the state may be interested or lands al-ternating therewith, surveyed or resurveyed, and field notes or corrected field notes of same returned to his office by any surveyor appoint-ed under this law, which field notes shall have the same force and effect as if made by the county or district surveyor of the county or district in which said land lies; and, upon the adoption and approval of said field notes by the commissioner of the general land office, he shall forward to the surveyor, of the county or district in which said land lies, certified copies of said field notes, which thereafter shall be a part of the record of said surveyor's office. In carrying out the provisions of this law, the commissioner of the general land office may, when requested by the owner of lands alternat-ing with the lands resurveyed, under the provi-sions of this law, cancel patents, and in lieu thereof issue patents in accordance with said resurvey, provided that all such owners shall pay the expenses incurred in making such cor-rected surveys of their lands, and in issuing said patents.

"I therefore conclude, as a conclusion of law, that under said statute of 1887, as above set

out, the commissioner of the general land office had the right, power, and authority to have said resurvey made by the said W. D. Twitchell, under his control and direction, and, when so made, to approve the said corrected field notes, if found by him correct and in compliance with his direction, and that when said corrected field notes were examined and approved by said land commissioner, and certified copies of the same forwarded to the surveyor of the county in which said land lies, and when made part of the records of said surveyor's office, said corrected field notes so made, returned, and filed are binding and of full force and effect against all parties affected thereby, including the state, in the absence of fraud or mistake, or the intervening rights of other parties, not parties thereto; and, no fraud or mistake or the intervening rights of other parties having been shown in this case, judgment has been rendered for the plaintiff upon the intervention of the state filed in this cause.

"Geo. Calhoun,
"Judge Fifty-Third Judicial District."

It is true, as found by the court, "that the original field notes of the surveys offered in evidence in this case * * * do not cover all of the land sought to be recovered by the state." That is to say, as we understand the evidence, the surveys to the south and west of the alleged vacancies are located upon the ground by established corners, found and recognized by objects called for in their field notes. The only corner in the surveys to the east and north of the alleged vacancies, capable of being identified by objects called for in the field notes, is the Cobb corner, nine miles east of the alleged western vacancy, and ten miles north of the alleged southern vacancy. Such being the case, the proper way to resurvey the lands to the east and north is to begin at said Cobb corner and run out the survey's course and distance as called for in the field notes. To so run said surveys would leave at least a portion of the land sued for vacant. But the surveyor Twitchell assumed that a series of pits and mounds extending nine miles north and south were the corners of a tier of said surveys six miles west of the Cobb corner; and, if so, said tier of surveys would be further west and south than course and distance from the Cobb corner would place them by about the width of the alleged vacancy. If we were required to pass upon this as an original proposition from the evidence in the record, we would say that Twitchell made a mistake in locating the surveys east and north of the alleged vacancies; but, as we understand the act of 1887, it does not follow from this that we should reverse the case.

We think the commissioner of the land office was authorized under the act of 1887 to have these lands resurveyed. Gen. Laws 1887, p. 107; articles 5347–5349, R. S. 1911. The state was interested in seeing whether or not there was a vacancy. An alleged vacancy other than sued for herein, was discovered by Twitchell, and Post bought the same from the state. We concur in the conclusion of law reached by the learned trial judge that the "corrected field notes so made, returned, and filed are binding and of full force and effect against all parties affected thereby, including the state." The evidence shows that some 10,000,000 acres of land have been resurveyed under this act. Such is the imperfection of surveyors' compasses, chains, and chain carriers that perhaps not a single one of these resurveys is mathematically correct, and the same would be true if they were again resurveyed. If for that reason they are subject to future correction, there will be no end of litigation with reference to these lands. The purpose of this act was to establish the lines and corners of these lands; this was intrusted to surveyors selected by the state; and, in the absence of fraud, the state should be bound by their action in the premises.

The Attorney General contends that, if the action of the state surveyor is to be construed as final, the act of 1887 is unconstitutional, as applied to the facts of this case, for the reason that, in approving the survey made by the state surveyor, the commissioner of the land office gave to appellee public school land, and that the Legislature had no authority to give away these lands, or to authorize any one else to do so. True, but the Legislature was authorized to ascertain what lands were and what were not school lands. To this end the Legislature was authorized to have surveys made, and to make such surveys conclusive, where intervening rights of third parties were not involved. Suppose the state had brought suit against the owner of a tract of land to establish the boundaries of such tract, as it has in this case, and the boundaries of such survey had been established by the judgment of a court of last resort so as to include within its boundaries land which was in fact school land. The owner of such survey would have become the owner of the school land erroneously adjudged to be included within its boundaries, not because the court had the right to give away school land, but because it had the power to adjudge that it was not school land. And so in this case appellee must be held to be the owner of the land in controversy, not because the surveyor and the commissioner had the right to give him school land, but because the Legislature adopted this method of determining whether or not it was school land; and, in the method pointed out by law, it has been determined that the land in controversy is not school land. The method adopted by the Legislature of having the lands resurveyed under the supervision of the commissioner of the general land office, by a bonded and sworn surveyor, selected by him, was a reasonable method, for, had these matters been adjudicated in the courts, the location of boundary lines would have necessarily depended upon a resurvey of the lands. We think that it was the intention of the act of 1887 to make the re-

surveys made in accordance with said act binding upon the state, and that said act is constitutional.

Finding no error in the record, the judgment of the trial court is affirmed.

Affirmed.

### On Motion for Rehearing.

### Findings of Fact.

(1) The following map shows the position of the land in controversy, and of the adjoining surveys:

east of the land in controversy show by their calls to have been run from east to west, and are tied by their intervening calls to the Cobb corner. All of said surveys, except Nos. 1413, 1414, 1425, 1426, 1427, 1428, 1429, and 1430, were made prior to the time the surveys on the south and west were made.

(5) The surveys on the south and west were made from the south and west to the north and the east, and there is no dispute in the testimony in the record as to the true

(2) The corner marked "Cobb" is a well-identified corner. No other corners in the block of surveys lying north or east of the land in controversy can be identified by any natural or artificial objects called for in their field notes.

(3) The corners marked "Camp Branch," "Grapevine," and "B. B." are well-identified corners. There are other recognized corners in the blocks of surveys lying south and west of the land in controversy.

(4) The surveys in the block north and

location of such surveys. Their boundaries are shown to be as indicated on the above map.

(6) The state surveyor, Twitchell, in 1905 and 1906, under the direction of the commissioner of the land office, who assumed to act under the law of 1887, ran out the surveys indicated on the above map, and extended the surveys on the east and north of the land in controversy to the west and south, so as to include in said surveys the land in controversy. If said surveys be run from the Cobb

corner, course and distance, as called for in their field notes, the western side of said block of surveys will be fixed 104 varas further east than is claimed by the state and shown by said map. This for the reason that Standifer, who made the survey for the state, recognized rocks found at the Northeast and Northwest corners of survey 1255, but not called for in its field notes, as the corners of said survey; thus giving surveys 1255, 1256, and 1257 a total excess of 104 varas. Running out said survey's course and distance from the Cobb corner fixes the south boundary of said block of surveys as claimed by the state and shown on said map.

(7) Twitchell made said survey at the request and expense of the owners of said surveys, but said surveys were all patented at said time, and the patents have never been surrendered for cancellation, and no patents have issued upon Twitchell's survey.

### Opinion.

[1] 1. In our former opinion herein we held that the survey made by the state surveyor under the act of 1887 was conclusive against the state as to the true location of the land owned by appellee. A further consideration of the case has led us to conclude that we were in error in the construction that we placed upon said act.

[2] Aside from this fact, when said survey was made, a surveyor could not correct the field notes of a previous survey, without having the certificate in his hands, unless such survey was in conflict with land previously appropriated, and then only to the extent of such conflict, and he could not include in the corrected field notes any land not included in the original file or location. R. S. 1895, arts. 4130 to 4141; Railway Co. v. Thompson, 65 Tex. 186; Adams v. Railway Co., 70 Tex. 252, 7 S. W. 729; Sanborn v. Gunter, 84 Tex. 285, 17 S. W. 117, 20 S. W. 72; Childress L. & C. Co. v. Baker, 23 Tex. Civ. App. 451, 56 S. W. 756. We quote from the last case above cited as follows:

"We think the charge of the court announced with reasonable fairness and correctness the rules of law applicable to the case."

While it does not appear in the opinion, the record in the case discloses the fact that the land in controversy had been resurveyed by the state surveyor under the act of 1887; that it was the contention of appellant that the resurvey precluded the state from claiming the surveys in controversy according to the original location; and that the court, among other things, charged the jury as follows:

"The resurvey made by the state surveyor Long, under the direction of the land commissioner and approved by the land commissioner under the act of 1887, may be considered by you for what you may deem it worth, if anything, in connection with all the other evidence in the case, to enable you to determine where the original survey really placed the land, but for no other purpose."

Our attention was not called to this case on the original hearing.

[3] 2. A state surveyor appointed under the act of 1887 had such authority as had theretofore been conferred by law upon district and county surveyors, and their deputies, and none other, except that at the request of owners of patented lands, alternating with surveys made for the common school, university, or asylum funds, or other lands belonging to the state, or in which the state was interested, he might survey such patented lands without having the certificates for the same in his hands, but the corrected field notes so made by him had no force unless the owners of such patented lands surrendered their patents and accepted new patents in accordance with such resurvey. This was not done in the instant case.

[4] 3. The purpose of the act of 1887, in addition to fixing and marking upon the ground the true lines and corners of public lands, so that purchasers thereof could know what they were getting, was, as is declared in the first section thereof, "for the purpose of ascertaining conflicts and errors, and making proper correction of surveys," etc.

The resurvey as made by the state surveyor Twitchell does not disclose any conflicts in any of the original surveys, and, if any such exist, he did not attempt to correct them. Said resurvey did not disclose any errors in the original surveys, except excesses in some of the surveys to the west and south of the land in controversy, which errors he did not attempt to correct, and should not have done so as to corners identified by objects found on the ground, and also errors in calls for the corners of other surveys. For instance, the northeast corner of survey 403 calls for the southeast corner of 1326; the northeast corner of 552 calls for the southeast corner of 1,365; the northeast corner of 556 calls for the southwest corner of 1,370; the northeast corner of 561 calls for the southwest corner of 1,372. To have extended these surveys to the corners called for would have materially altered their configuration. For example, the east line of 403 would have been extended 537 varas north and 103 varas east, and the east line of 561 would have been extended 349 varas north and 570 east.

[5] The state surveyor did not correct said surveys calling for said corners by extending them to the corners called for, but extended the surveys called for to the surveys calling for them. Calls for course and distance in the field notes of a survey may, in a proper case, be extended and varied to fulfill other calls in its field notes, but cannot be so extended or varied to satisfy the calls in another and junior survey.

[6] These calls for the corners of prior surveys were calls for open, unmarked prairie corners, and, under the facts and circumstances in evidence, appear to have been made from conjecture, and will not

prevail over calls for course and distance. As above stated, they were not attempted to be given effect by the state surveyor, in so far as they affected the location of the surveys in which such calls were made, but what he did was to extend the surveys to the north and south of the land in controversy, so as to make them cover the same. In the absence of natural or artificial marks called for in the field notes showing error in course or distance, and in the absence of proof as to how surveys were actually made, they must be run out course and distance from known corners with which they connect by their callings.

[7] 4. The commissioner of the land office has no authority, except such as is conferred upon him by law. Hanrick v. Cavanaugh, 60 Tex. 24; Gaither v. Hanrick, 69 Tex. 97, 6 S. W. 619; N. Y. L. Co. v. Thomson, 83 Tex. 181, 17 S. W. 920; Day v. State, 68 Tex. 553, 4 S. W. 865; Railway Co. v. State, 36 S. W. 116.

[8] Certainly no law prior to the act of 1887 conferred upon the commissioner the power to establish the boundary between land owned by the state and patented surveys by appointing a surveyor and having him run such line, nor did the act of 1887 do so. The power conferred upon him to have lands in which the state was interested resurveyed, so as to correct errors in previous surveys, did not authorize him, by approving erroneous surveys, to thereby change the lines and corners of patented surveys, so as to include therein land not included in the field notes of such patented surveys as originally run and patented.

[9] 5. If the lands in controversy were not in fact included within the bounds of appellee's patented surveys, as the same were originally made, they were public lands, and if the act of 1887 authorized the commissioner to extend the bounds of such surveys so as to include, in addition to lands within said surveys as originally made, the land in controversy, such act would be without constitutional authority. Not only so, but as the resurvey was made in 1905 and 1906, and as all public lands in this state had been set aside to the school fund by the act of 1900 (Acts of 1st Called Sess. p. 31), the Legislature was positively prohibited by the Constitution from disposing of these lands, and from authorizing the commissioner to do so at the time of such resurvey, except by selling the same. Const. of Tex. art. 7, § 4. To include the lands in controversy in appellee's patented survey by extending the lines thereof beyond their original location is not to sell such lands as required by the Constitution, but is to give them away.

[10] It will not be presumed that the Legislature intended an act to be so construed as to render it unconstitutional. But, even if it could be held that the act of 1887 intended to empower the land commissioner to give away public lands under the guise of establishing boundary lines, such act, in so far as it applies to the land in controversy, must be held to have been repealed by the act of 1900 above referred to.

6. It was immaterial, under the construction which we gave to the act of 1887 in our former opinion, whether all or only a part of the land in controversy was not included in appellee's patented surveys, as originally run, but such fact becomes material under the construction of said act as herein given. We have carefully examined the field notes and the testimony in the record, and find therefrom that none of the land in controversy was so included in said patented surveys.

[11] 7. Appellee contends that inasmuch as surveys 1430, 1427, and 1428 call to connect with the surveys to the east, and also with the surveys to the west, they having been made subsequent to the making of the surveys to the east and also on the west, and in each instance the calls are for unmarked prairie corners, it cannot be told whether the vacancy, if any, is on the east or on the west of said surveys, and that therefore the state had failed to make out its case as to this tract. The court takes judicial cognizance of the fact that the state was originally the owner of all lands in Texas not granted by the government of Spain, or of Mexico or the Republic of Texas, prior to the organization of this state.

[12] This presumption makes a prima facie case in favor of the state as to any lands for which it may bring suit, and such prima facie case can be met only by showing a grant to such lands. The state is the common source, and whatever title appellee had must have been derived from the state. State v. Delesdenier, 7 Tex. 96, 97; Hamilton v. State, 152 S. W. 1120. Appellee claimed that land by virtue of his ownership of surveys Nos. 1430, 1427, and 1428. He who claims by virtue of a grant, when the boundaries of the same are in issue, must show the location of such boundaries, and that the land in controversy is included therein.

For the reason above stated, the appellant's motion for a rehearing is granted; the judgment of the trial court is reversed; and judgment is here rendered for appellant for the land described in its petition.

KEY, C. J. On account of facts which have come to my knowledge since the former judgment in this case was rendered, I have not participated in the consideration and decision of the motion for rehearing.