**STATE et al. v. ARNIM et al.**

No. 11294.

Court of Civil Appeals of Texas. San Antonio.

July 14, 1943.

Rehearing Denied Aug. 4, 1943.

504

Gerald C. Mann, Atty. Gen., and Cecil C. Rotsch, Fagan Dickson, and Peter Maniscalco, Asst. Attys. Gen., for the State.

Rockey Harkey, of Sinton, for appellant A. D. Aikin.

Boone, Henderson, Boone & Davis and W. B. McCampbell, all of Corpus Christi, and W. B. Moss, of Sinton, for appellees.

NORVELL, Justice.

Two questions are involved in this appeal: (1) Is the Henry Sheston Survey No. 2, San Patricio County, riparian to Nueces Bay? (2) Did the deeds executed.

by J. H. Drummond conveying Lots Nos. 6, 7 and 8 out of the Drummond Subdivision of a 4049-acre tract of land vest in the grantees (and appellees holding under them) riparian rights in and to Nueces Bay?

This is a consolidated cause. Four separate suits, similar in nature to trespass to try title actions, were brought in accordance with the provisions of Article 5421c, § 6, Subdivision j, Vernon's Ann.Civ.Stats., General Laws 1939, 46th Legislature, pp. 472, 473. A. D. Aiken, who allegedly asserted a claim to the lands involved under a mineral lease executed by the Commissioner of the General Land Office, was named defendant. The State of Texas by its Attorney General intervened and filed a not guilty plea.

Trial was to the court without a jury. Express findings of fact and conclusions of law were filed.

Judgment was rendered against the plaintiffs below, who (in Cause No. 5373) asserted title to Lots 9 and 10 of the Drummond Subdivision, and no appeal was taken from this part of the judgment. The asserted owners of Lots Nos. 6, 7 and 8 of the Drummond Subdivision were, however, awarded judgment against the State and Aiken. The effect of this judgment was to recognize and establish said lots as riparian to Nueces Bay.

It appears that appellees Arthur Starr, Corrie B. Fitzsimmons and Gordon Boone are the owners of Lot No. 6 (involved in Cause No. 5376); Connie May Starr and Arthur Starr are the owners of Lot No. 7 (involved in Cause No. 5375); and F. V. Arnim and Kathleen Lord Arnim are the owners of Lot No. 8 (involved in Cause No. 5374). The Phillips Petroleum Company claims a mineral leasehold estate in each of the three lots mentioned.

There appears to be no controversy as to actual location of various lots in the Drummond Subdivision upon the ground. However, upon the trial a considerable controversy developed as to the actual location of the lines of the original surveys included within the Drummond Subdivision. The location of these lines with reference to the Drummond Subdivision was, however, settled by the trial court's finding that "Lot No. 6 of said Drummond Subdivision lies wholly within said W. W. Bell Survey No. 3. The larger portion of Lot 7 of said Drummond Subdivision lies in said W. W. Bell Survey, and the remaining portion of said lot lies within and is a part of said Sheston No. 2 Survey; Lot 8 of said Drummond Subdivision is also a part of said Sheston No. 2 Survey."

Appellees do not attack the trial court's finding above set out, by either cross-point or cross-assignment, and consequently the finding is binding upon us.

As above indicated, the Drummond Subdivision is a resubdivision of a number of surveys or parts of surveys in the vicinity of Nueces Bay. We are here primarily interested in Henry Sheston Survey No. 2, and W. W. Bell Survey No. 3, and incidentally in Henry Sheston Survey No. 1. Unless Lots Nos. 6, 7 and 8 of the Drummond Subdivision, and also Sheston No. 2, or Bell No. 3, include the lands in controversy, appellees are without title. Appellees assert that Bell No. 3 is a riparian grant, and also that the part of Sheston No. 2 which includes Lot No. 8 and a part of Lot No. 7 of the Drummond Subdivision borders on Nueces Bay, and is consequently riparian thereto. The State admits that Bell No. 3 is riparian, but vigorously contends that Sheston No. 2 is not. The lands involved are primarily accretions along the bay shore.

In 1838, John R. Talley, deputy surveyor of Refugio County, located a series or system of twelve contiguous surveys for Henry Smith, the assignee of the holders of various land warrants under which the surveys were authorized. Patents for these surveys were afterwards issued to Smith by the State of Texas.

These twelve surveys were located by Talley near the mouth of the Nueces River in the vicinity of Nueces Bay, some of them being upon the shore of the bay. The bay shore line in the area with which we are here concerned runs approximately east and west. The first survey located by Talley for Smith was Henry Sheston No. 1, the westernmost survey of the Smith system. Talley's field notes for this survey read as follows: "No. 1 commences at a stake in a lagoon or marsh from which a small hackberry 3 inches in diameter bears S 67-¼ E distant 13.76 chs (327 vrs) and another 6 inches in diameter bears N. 49 E thence meandering the bluff bank of high land (separated from the river by marsh and lagoons for the distance of about 2 miles) S 67-½ E 17.72 chs (421 vrs.) S 78-

¾° E 64.82 chs. (1540 varas) North 4.72 chs (112 vrs) to the Southeast corner a stake from which the White Bluff bears S 44-¾ E and a hackberry 12 inches in diameter bears N 40-½ W distance 7.55 chs (179 vrs.) thence North 83.64 chs. (1987 vrs.) to the N.E. corner a stake and mound, thence West 80 chs. 1905.6 varas) to the N.W. corner a stake and mound—thence South 68.92 chs. (1637 vrs.) to the beginning."

Sheston No. 1 is not a riparian survey, and appellees do not contend that it is.

Immediately to the east of Sheston No. 1, Talley located Sheston No. 2, with the following field notes: "No. 2 commences at the S.E. corner of the foregoing survey thence meandering the bluff bank East 23.72 chs (563 vrs.) South 13.00 chs. (309 vrs.) N. 62-½° E 10.00 chs. (238 vrs.) S. 57-¾ E 10.00 chs (238 vrs.) S 85-½ E 14.00 chs. (333 vrs.) S 24-¼ E 7.00 chs. (166 vrs.) S 84-½ E. 10.00 chs. (238 vrs.) N. 51-½ E. 15.55 chs. (369 vrs.) South 11.48 chs. (273 vrs.) to S.E. corner stake on the bluff, from which the mouth of the Nueces bears S. 3-¾° E. and a hackberry in a grove bears N. 20-½ W distant 3.15 chs. (75 vrs.) diameter 6 inches, thence north 93.14 chs. (2212 vrs.) to the N.E. corner a stake and mound, thence West 80.00 chs. (1905 vrs.) to the N.W. corner a stake and mound, thence South 69.18 chs (1647 vrs.) to the beginning."

We here remark that if the field notes of Sheston No. 2 be considered alone, it can hardly be said that Sheston No. 2 is a riparian survey. Nueces Bay is not called for in the field notes and the south boundary line consists of a meander line along the bluff and not along the shore of the bay. The evidence clearly shows that at the time of trial there existed a bluff or steep bank varying in height from thirty to fifty feet above the low flat land separating it from the bay shore. The indications are that a similar condition existed at the time of Talley's survey, although, of course, the area of flat low land separating the bluff from the shore line was probably not nearly so great as it is at the present time. It may have been a comparatively narrow strip in 1838.

Immediately to the east of Sheston No. 2, Talley located Bell No. 3, an admittedly riparian survey. Talley's field notes of this survey are as follows: "Commencing at

the S.E. corner of Survey No. 2 thence meandering the bay shore East 64.00 chs. (1524.4 vrs.) S 9-½ E 45.00 chs. (1072 vrs.) S 26 E 19.55 chs. (465.7 vrs.) to the S.E. corner a stake from which White Bluff bears S 3-¼° E, the mouth of the Nueces bears S 23-¾° W and a hackberry (in a grove) 7 inches in diameter bears N 88-¾ W distant 3.21 chs. (76.4 vrs.), thence North 134.19 chs. (3196.4 vrs.) to a stake and mound the N.E. corner, thence West 80. chs. (1905.6 vrs.) to a stake and mound the N.W. corner, thence South 72.24 chs. (1720.7 vrs.) to the beginning—3.613280 Sq. varas."

Since the three surveys mentioned are a part of one system of surveys, we may properly consider the southern boundary lines of all three surveys as if they were in fact the southern boundary line of one survey. By combining Talley's notes of his southern boundaries of the three surveys, we obtain the following line extending from the Southwest corner of Sheston No. 1 to the Southeast corner of Bell No. 3, viz.: "Commencing at a stake in a lagoon or marsh (S.W. corner of Sheston No. 1) thence meandering the bluff bank of high land S 67½° E. 421 varas; S. 78-¾° E. 1540 varas; North 112 varas to a stake, being the S.E. corner of Sheston No. 2; thence meandering the bluff bank East 563 varas; south 309 varas; N. 62-¼° East 238 varas; South 57-¾° East 238 varas; South 85½° East 333 varas; South 24-¼° East 166 varas; South 84½° East 238 varas; North 51½° East 269 varas; south 273 varas to S.E. corner stake on the bluff; (S.E. corner of Sheston No. 2 S.W. corner of Bell No. 3), thence meandering the bay shore East 1524.4 varas; South 9½° E. 1072 varas; South 26° East 465.7 varas to a stake at the southeast corner of Bell No. 3."

It seems to be appellees' contention that as Talley begins to meander the bay shore at the Southwest corner of the Bell, and Talley makes the southwest corner of the Bell identical with the Southeast corner of Sheston No. 2, the common point or corner must be accepted as being upon the bay shore although Talley in the Sheston No. 2 field notes refers to "S.E. Corner stake on the bluff." From this it is inferentially argued that the south line of Sheston No. 2 must have run to the bay shore line some distance west of the Southeast corner designated by Talley. Some such

view must have been entertained by James W. Peeks, County Surveyor of San Patricio County, when, in 1879, he located a part of the Coleman and Fulton survey south of the western part of Sheston No. 2, and called for a Northeast corner—a stake set on the shore of Nueces Bay. Peeks' call from the Southwest corner of Sheston No. 2 to his Northeast corner on the shore line was S. 66½° E. 766 varas, indicating his belief that Sheston No. 2 from a point S 66½° E. 766 varas from its Southwest corner to its Southeast corner lay along the shore of Nueces Bay.

Copies of certain maps in the General Land Office (compiled after 1838) were introduced in evidence. These maps purport to show the location of Sheston No. 2 or at least a part thereof upon the bay shore. In connection with his field notes of Sheston No. 1 and No. 2, Talley set forth a small sketch of these two surveys, the scale employed being 2,000 varas to the inch. A similar sketch was also made of Bell No. 3. Nueces Bay is not designated on these small sketches, and it might as well be said that they indicate that Sheston No. 1 is a riparian survey as to say that they indicate Sheston No. 2 or a part thereof is riparian.

We think the matter is controlled by Talley's field notes and that they conclusively show that Sheston No. 2 is not a riparian survey. If we accept appellees' contention that the Southwest corner of Bell No. 3 is on the bay shore, the Sheston No. 2 call therefrom (reversed) is North 273 varas. The field notes of Sheston No. 2 actually close 273 varas North of Talley's designated Southeast corner of Sheston No. 2, which is the designated and actual Southwest corner of Bell No. 3. We repeat the two calls to the Southeast corner of Sheston No. 2 and the first call from said point as given by Talley: North 51½° East 369 varas; (thence) South 273 varas to Southeast corner; (thence) North 2212 varas to the Northeast corner. Now it is apparent that so far as enclosure of land is concerned the actual Southeast corner of Sheston No. 2 is at a point where the line established by the course North 51½° East intersects the line established by the North call, which is 273 varas north of the Southwest corner of Bell No. 3. Talley's action in running south to a designated corner and then immediately reversing his direction and running north, simply doing away with the south call insofar as the enclosure of land is concerned,

may be rather unusual, but the field notes themselves admit of no other construction. We think this was simply Talley's method of tying Sheston No. 2 into Bell No. 3, and that his intention was to establish the actual Southeast corner of Sheston No. 2 at a point 273 varas north of the Southwest corner of Bell No. 3. While it may be permissible to say that the Southwest corner of Bell No. 3 and the designated Southeast corner of Sheston No. 2 was on the bay shore, although Talley called for the bluff, it can not be said that a point 273 varas north (the actual Southeast corner of Sheston No. 2) was on the bay shore despite Talley's call for the bluff. This point Talley definitely placed upon the bluff as he did all points intervening between said point and the Southwest corner of Sheston No. 2 by his statement, "thence meandering the bluff bank."

We hold Sheston No. 2 is not a riparian survey. Weatherly v. Jackson, 123 Tex. 213, 71 S.W.2d 259; Burton v. McGuire, Tex.Com.App., 41 S.W.2d 238; State v. Post, 106 Tex. 468, 169 S.W. 407; Id., Tex.Civ.App., 169 S.W. 401; Anderson v. Stamps, 19 Tex. 460; Brooks v. Slaughter, Tex.Civ.App., 218 S.W. 632; Keystone Mills Co. v. Peach River Lumber Co., Tex.Civ.App., 96 S.W. 64; 7 Tex.Jur. 232.

The second question involved upon this appeal relates to the proper construction of the deeds from J. H. Drummond conveying Lots 6, 7 and 8 to the predecessors in title of appellees. These conveyances described the lots by reference to the plat of the Drummond subdivision on file in the Map Records of San Patricio County, in Vol. 1, page 15 thereof. In view of our holding above set out, the question is of importance in connection with that part of Lot 7 and all of Lot 6 which lies within the riparian survey, Bell No. 3. The State, while admitting that Bell No. 3 is a riparian survey, contends that none of the lots in the Drummond Subdivision are riparian. The point seemingly involves a contention of paramount title in a third person under a not guilty plea.

It seemed to be conceded that J. H. Drummond acquired title to the Sheston No. 2 and Bell No. 3 by virtue of a deed from Francis Smith, conveying a total of 4049 acres by a metes and bounds description. Further, from the description contained in

this deed, it is apparent that the grantor was under the impression that the lands in the particular area here involved were riparian to Nueces Bay. By this conveyance Drummond therefore acquired title to' Bell No. 3 which extended to the shores of the bay. In 1905, Drummond filed a map or plat subdividing into fifty-three lots the entire 4,049 acres conveyed to him by Smith. This is the plat referred to in the conveyances to appellees' predecessors in title. Neither the map nor the dedication thereto makes any mention of the original surveys under which the lands were patented. The map depicts a roadway bordering Nueces Bay and lying immediately south of Lots Nos. 6, 7 and 8. Near the eastern end of the road, as shown on the map, appears the notation "To Portland," while on the western end appears the notation "To Kaleta." Certain other roads or streets are shown on the map and the dedication in part reads as follows: "It is my purpose and I do hereby dedicate the additional streets (to the now existing public road) which are shown on plat for the use and benefit of the owners of the adjoining tracts which are dependent upon such streets for an outlet egress and ingress and for that purpose alone."

There seems to be no doubt that the "now existing public road" referred to by Drummond was the Kaleta-Portland road shown on the plat. The trial court found, and such finding has support in the evidence, that this road was a permissive passageway used by the public without objection by the owners of the land through which it ran until it was wholly abandoned a number of years ago.

The State contends that as the deeds out of Drummond referred to the map, these conveyances extended only to the center of the road shown upon the plat, and consequently the grantees never acquired lands bordering on the bay shore. Consequently Drummond's grantees and appellees claiming under them never acquired any rights to the accretions along the bay shore.

 The question is one of construction of deeds. Obviously, Drummond could have conveyed or retained any part of the real property he owned. There are, however, certain principles of public policy involved in land conveyancing. One is that which tends to discourage separate ownership of narrow strips of lands. Such strips are of course subject to ownership and when an intention by a grantor to retain or except such a strip out of a conveyance is expressed or made clear, his intention will be respected by the courts, but where such intention is not discernible from the language employed in the conveyance, the presumption is that the grantor acted in accordance with the established public policy of the State and did not intend to retain ownership of a narrow strip of land that would be of no value or of very slight benefit to him. This is the basis of the rule that generally the grantee of a lot abutting upon a roadway (an easement) takes the fee to the center of the roadway subject to the easement. When, however, the roadway runs along the margin of a tract of land and the owner executes a conveyance thereof, the application of the principle above discussed serves to vest in the grantee the fee of the entire tract, including the land underlying the marginal roadway. Cantley v. Gulf Production Company, 135 Tex. 339, 143 S.W.2d 912; Cox v. Campbell, 135 Tex. 428, 143 S.W.2d 361. We think the rule as to marginal roads, emphatically stated by the Supreme Court in the cases cited, has application to the facts of this case. Of primary importance here is Drummond's intention. Upon his map he placed the Kaleta-Portland road upon the southern boundary of the lands described in his deed from Smith, that is, upon the shores of the bay. Drummond retained nothing south of the southern boundary line of the road which is depicted on the map as being the northern boundary line of Nueces Bay. The principle applicable to marginal roads was applied by the Supreme Court of Washington to a fact situation similar to that disclosed by the record here. See Gifford v. Horton, 54 Wash. 595, 103 P. 988. A different rule may and has been applied to cases involving a lot abutting upon a roadway which borders a non-navigable stream or river. In such instances the grantor owns the land to the thread of the stream and the roadway is therefore not marginal. See Anderson-Prichard Oil Corporation v. Keyokla Oil Co., 149 Okl. 262, 299 P. 850. Here Drummond's ownership (insofar as Bell No. 3 was concerned) terminated at the line of mean high tide of the bay and according to the map this was also the southern boundary of the roadway.

The State relies upon Gibson v. Carroll, 180 S.W. 630, by this Court, which is clearly distinguishable from the present case,

in that the dedicator and grantor, Doswell, expressly reserved and stated his intention to retain all accretions and alluvion, and conveyed to the grantee no riparian rights. This Court simply gave effect to these intentions as expressed in the deed and the plat referred to therein.

We hold that the part of Lot 7 of the Drummond Subdivision lying within Bell Survey No. 3 borders on the bay shore, as does Lot No. 6 of the said subdivision. All of Lot 6 and the designated part of Lot 7 are riparian to Nueces Bay, and consequently the owners thereof are entitled to the accretions along the bay shore.

Our holding above stated is further supported upon a somewhat different theory by the case of Hagan v. Campbell, Alabama, 8 Porter 9, 33 Am.Dec. 267. The permissive roadway here involved is in many respects similar to the reserved right of way mentioned in the Alabama case, wherein it was held that the reservation in a grant of a right of way along a river bank did not affect the grantee's right to alluvial formations along the river bank.

There being no appeal from that part of the trial court's judgment providing that the plaintiffs in cause No. 5373 (involving Lots Nos. 9 and 10) take nothing, this part of the judgment will not be disturbed.

There being no error in that part of the judgment awarding plaintiffs in cause No. 5376 (involving Lot No. 6) a recovery against Aiken and the State, this part of the judgment is affirmed.

■ That part of the judgment which awards the plaintiffs in cause No. 5375 (involving Lot 7) a recovery against Aiken and the State is reversed, and said cause No. 5375 is remanded to the trial court with directions to proceed in accordance with this opinion and enter judgment for the plaintiffs in said cause for that part of lands involved which lies within the boundaries of Bell Survey No. 3; and to render judgment for Aiken and the State for that part of the land involved in said cause which lies south of the south boundary line of Henry Sheston Survey No. 2.

That part of the judgment which awards the plaintiffs in cause No. 5374 (involving Lot No. 8) a recovery against Aiken and the State is reversed, and said cause No. 5374 is remanded to the trial court with directions to proceed in accordance with this opinion and enter judgment for Aiken and the State for that part of the lands involved in said cause which lie south of the south boundary line of Henry Sheston No. 2.

One-third of the costs of this appeal are taxed against Aiken and the State; two-thirds of the costs of appeal are taxed against the plaintiffs in causes Nos. 5374 and 5375.

Affirmed in part, and in part reversed and remanded with directions.

### On Motion for Rehearing.

■ ■ Appellees, in their motion for rehearing, assert that we erred in seeming to "regard Talley's meander lines (of Sheston No. 2) as his boundary lines." As we understand it, a meander line is subject to the same rule of construction applicable to any other kind of a boundary line. A meander line generally contains a call for a natural object or monument which under the well recognized rule will usually control over calls for course and distance. This general rule, is however, applicable to all lines sought to be established by field notes containing calls for either natural or artificial objects. St. Clair County v. Lovingston, 90 U.S. 46, 23 L.Ed. 59; State v. Atlantic Oil Producing Co., Tex.Civ.App. (writ refused) 110 S.W.2d 953.

■ The natural object called for by Talley's meander line of Sheston No. 2 is the "bluff bank." The point at which Talley's meandering begins (insofar as Sheston No. 2 is concerned) is the Southeast corner of Sheston No. 1 and the Southwest corner of Sheston No. 2. No one contends that this point is on the shore of Nueces Bay. The call to the "bluff bank" can not therefore be construed as have certain calls to a "river bank" in surveys which have been examined by the courts in numerous reported cases. For example, see Burkett v. Chestnutt, Tex.Civ.App., 212 S.W. 271. The field notes of Sheston No. 1, for instance, preclude the adoption of the view that by a call to the "bluff bank," Talley intended to place that survey or the southeast corner thereof on Nueces Bay.

Coming now to a consideration of Talley's course and distance call immediately preceding his stated location of the southeast corner of Sheston No. 2, which is south 273 varas, it seems reasonably clear that we would be justified in varying this course and distance call only upon proper proof

that a natural object called for by Talley's notes demanded that this be done. Such proof is not contained in the record. Further, the call to a natural object is a call to the "bluff bank," and we fail to see how the recognition of a call to this natural object aids appellees' contention that a part of Sheston No. 2 is riparian to Nueces Bay. We find no fact situation disclosed by the record here which would warrant the presumption or inference that because the southwest corner of Bell No. 3 is on Nueces Bay, a point, either 273 varas north of the corner, or on the bluff bank somewhere in the vicinity of 273 varas north of the corner, is also on the bay shore.

In our opinion, Talley's field notes do not place Sheston No. 2 on the bay shore, and these field notes are controlling of the matter.

Further discussion is deemed unnecessary. We adhere to the holdings expressed in the original opinion. Appellees' motion for rehearing is overruled. We also overrule the motion for rehearing filed herein by appellants.