**KIRBY LUMBER CORPORATION et al.,**
Appellants,

v.

**T. A. CAMPBELL, Jr., et al., Appellees.**
No. 6059.

Court of Civil Appeals of Texas.
Beaumont.
Jan. 7, 1960.
Rehearing Denied Feb. 3, 1960.

Fountain, Cox, Gaines & Fox, Blades, Kennerly & Whitworth, Burton W. Morris, Vinson, Elkins, Weems & Searls, Baker, Botts, Andrews & Shepherd, Houston, for appellants.

Wynne & Wynne, Dallas, for appellees.

Will Wilson, Atty. Gen., for intervenor.

ANDERSON, Chief Justice.

This is a vacancy suit, brought under authority of Article 5421c, Vernon's Texas Civil Statutes. It involves land adjoining the Sabine River in Newton County.

Their joint applications for mineral leases on two areas which they claimed to be parcels of vacant and unsurveyed public land having been denied by the Commissioner of the General Land Office, appellees T. A. Campbell, Jr., and E. J. Bailes, who will be also referred to as plaintiffs, filed two suits in the district court of Newton County, in order that the existence or non-existence of the alleged vacancies might be judicially determined. The actions were respectively numbered 4216 and 4276 on the docket of the court. The owners of the surveys that either include or abut or touch the alleged vacant areas were named as defendants, the owners of the John Spears and the Thomas S. McFarland surveys in the one instance (cause No. 4216), and the owners of the McFarland, the A. P. Walden, and the Seth Swift surveys in the other (cause No. 4276). The State, as required by the aforesaid statute, intervened in each suit as a plaintiff. The suits were consolidated for trial; but before the trial was concluded, the plaintiffs abandoned their efforts to establish that the land described in their petition in what was originally cause No. 4216 had not been surveyed and patented. What was originally cause No. 4276 was tried to completion before a jury; and, upon the jury's findings in response to special issues, a vacancy, bounded as claimed by the plaintiffs through their evidence, was adjudged to exist. What was originally cause No. 4216 having remained before the court after the plaintiffs abandoned prosecution of it, the land involved in that suit was adjudged not to be vacant and unsurveyed public land. The defendants in what was originally cause No. 4276 have appealed.

The following plat will aid understanding of the matters in issue:

The land in controversy is represented by the shaded portion of the plat and was commonly referred to in the evidence as the "boot".

The plaintiffs claim that the area is bounded on the west by the east boundaries of the McFarland and Walden surveys and that it touches the Swift Survey at only the latter's northeast corner. The defendants, on the other hand, claim that the area is included within and divided among the McFarland, Walden, and Swift surveys. They claim for the common boundary of the Walden and Swift surveys—the Walden's south boundary, the Swift's north—a more northerly location than do the plaintiffs and that the line extends across the alleged vacancy. The plaintiffs claim that the line's eastern terminus is on the river at the place that is represented on the plat by uncircled number 7.

The claim that the land in question has remained unsurveyed and unpatented is made in the face of these undisputed facts, viz.: In both the original field notes and the patent notes of the Spears, McFarland, Walden, and Swift surveys, the northeast and southeast corners of those surveys were represented as being on the river, and the surveys were represented as being bounded on the east by the river; all official maps and plats in evidence and depicting the surveys depict them as adjoining the river; the surveys have all along been dealt with, subdivided, and conveyed as river surveys; and marked lines which the defendants claim to be the perpetuated north and south boundaries of the surveys, as those boundaries were originally placed on the ground, have their eastern termini on the river, at locations that are represented on the plat by circled numbers 1, 7, 8, 30, 29.

So confronted, the plaintiffs have undertaken to prove that the representations in the field and patent notes of the McFarland and Walden surveys to the effect that the McFarland's southeast corner and the Walden's northeast corner had been established on the river and that the river had

been meandered all the way from those corners to the McFarland's northeast corner and to the Walden's southeast corner were and are erroneous representations which were made as a result of the surveyors having been mistaken as to the river's true location on the ground. More specifically, the plaintiffs have undertaken to prove that the McFarland's southeast corner and the Walden's northeast corner were both located originally at the place that is represented on the plat by uncircled number 8, which does not appear ever to have been on the river, and that neither the surveyor of the McFarland Survey nor the surveyor of the Walden Survey was on the river except north of the alleged vacancy and at the Walden Survey's southeast corner.

To explain the field and patent notes of the two surveys, the plaintiffs theorize that the McFarland's southeast corner and the Walden's northeast corner—both of which are supposed to be at the same place—were established on a slough or lake which the surveyors mistook for the river, but which no longer exists in its entirety, and that it was, for the most part, such slough or lake, and not the river, that the surveyors meandered.

There being no existent watercourse or body of water that substantially conforms for more than a comparatively short distance, if at all, to what they envision as having been mistaken for the river, the plaintiffs claim for the eastern boundaries of the McFarland and Walden surveys lines they, the plaintiffs, ran in accordance with their own adaptations of what were represented in the field and patent notes of the two surveys as being meander lines of the river. And in the trial court the surveys were adjudged to be so bounded.

The meander calls in the notes of the McFarland Survey called to run from the survey's southeast corner N. 5 W. 850 varas; N. 19 E. 220 varas; N. 59 W. 300 varas; N. 16 E. 255 varas. In purporting to give application to those calls, the plaintiffs ran the lines in reverse from the place at which

they, the plaintiffs, claim the McFarland's northeast corner was located originally (uncircled number 30 on the plat), which is not now on the river, and they lacked a little of running the last of the lines (reversed order) its called distance. As reversed, the lines were run in this manner: S. 16 W. 255 varas; S. 59 E. 300 varas; S. 19 W. 220 varas; ·S. 5° 1′ E. 830.3 varas.

The last of the lines (reversed order) was terminated at what the plaintiffs claim is a marked corner on an old slough (uncircled number 8 on the plat), and it is there, approximately 620 varas west of the river, that the plaintiffs would locate the southeast corner of the McFarland Survey and the northeast corner of the Walden Survey.

The location is either on or just off the line the defendants claim as the common boundary of the McFarland and Walden surveys.

As run by the plaintiffs, the second of the meander lines (reversed order) ran into and virtually across the river. The third one, however, returned to the west side of the river, and the point at which it emerged from the river is the most northerly point of the alleged vacancy.

In purporting to apply the meander calls contained in the notes of the Walden Survey (five in number), the plaintiffs coursed each of the lines toward a different quadrant of the compass from what the notes called for; that is, if the notes said run southeast, plaintiffs ran southwest, and if the notes said run southwest, plaintiffs ran southeast.

They claim that the wrong quadrants were inadvertently and erroneously called for in the field notes of the survey.

The field notes called to run from the Walden's northeast corner S. 40 E. 380 varas; S. 60 W. 300 varas; S. 20 E. 200 varas; S. 60 E. 500 varas; S. 30 E. 210 varas. From where they would locate the northeast corner of the survey (uncircled number 8 on the plat), the plaintiffs ran S.

40 W. 380 varas; S. 60 E. 300 varas; S. 20 W. 200 varas; S. 60 W. 500 varas; S. 26° 56′ W. 582½ varas.

It will be noted that, in addition to changing the quadrant, plaintiffs ran the last of the meander lines 3° 4′ off of its called course and gave it an excess of 372.5 varas over its called distance. This was necessary in order to arrive at the point at which the plaintiffs would locate the southeast corner of the Walden and the northeast corner of the Swift (uncircled number 7 on the plat). The notes of the Walden represented that the last of the meander lines carried to the Swift's northeast corner.

In treating—as they did in running the meander lines—the northeast corner of the McFarland Survey as being situated where they claim it was located originally (uncircled number 30 on the plat), the plaintiffs were but being consistent. In reconstructing the surveys and for evidentiary purposes, they have treated all of the eastern corners of the four surveys thus far mentioned—the Spears, the McFarland, the Walden, and the Swift—as being at the places where they, the plaintiffs, claim the corners were located originally (uncircled numbers 29, 30, 8, 7, 1, on the plat), though none of the places except the one at which plaintiffs would locate the Walden's southeast corner and the Swift's northeast corner is on the river at the present time.

The record leaves us somewhat uncertain about whether initially the plaintiffs claimed that neither the McFarland's northeast corner nor either of the Spears' eastern corners was ever on the river or only claimed that the river had changed its course in such manner as to create a vacancy opposite the northern part of the McFarland and the whole of the Spears; but, be that as it may, they conceded during the trial, as an incident of abandoning what had been cause No. 4216, that originally these corners were on the river, as the river ran when the corners were first established.

As regards their claimed locations for the McFarland's southeast corner and for

the Walden's and the Swift's northeast and southeast corners, the plaintiffs are in the attitude of claiming that the place at which they would locate the McFarland's southeast corner and the Walden's northeast corner (uncircled number 8 on the plat) has never been on the river; that the place at which they would locate the Walden's southeast corner and the Swift's northeast corner (uncircled number 7 on the plat) has been on the river continuously since before these corners were first established; and that the place at which they would locate the Swift's southeast corner (uncircled number 1 on the plat) was on the river, as the river ran when the Swift was first constructed.

The defendants take no issue with the first two of plaintiffs' three last-mentioned claims, but they do with the third; they deny that the place at which the plaintiffs would locate the Swift's southeast corner was on the river when the Swift was first constructed or has been since. At the same time, however, the defendants contend that all of the corners thus far dealt with were on the river originally. Not only so, but they contend that originally the corners were established either at or east of the places that are represented on the plat by circled numbers 1, 7, 8, 30, 29.

The jury, in response to separate special issues, found that the southeast corner of the Spears Survey (which is supposed to be also the northeast corner of the McFarland Survey), the southeast corner of the Mc-Farland Survey (which is supposed to be also the northeast corner of the Walden Survey), the southeast corner of the Walden Survey, the northeast corner of the Swift Survey, and the southeast corner of the Swift Survey were all located originally where the plaintiffs claim the corners were located; that is, at the places that are represented on the plat by uncircled numbers 30, 8, 7, 1. The jury, again in response to separate special issues, found also that the surveyor of the McFarland, at the time of constructing that survey, did not know the river's true location on the ground; that the surveyor of the Walden, at the time of

constructing that survey, did not know the river's true location on the ground; that the surveyor of the McFarland "mistakenly called [in his field notes] for the Whortleberry marking the [McFarland's southeast] corner, as witnessed by the Holly and Gum trees, to be upon the bank of the Sabine River"; in substance, that the surveyor of the Walden, "in locating the northeast corner" of that survey, began his survey at the place where the plaintiffs claim the northeast corner of the survey is situated (uncircled number 8 on the plat); and that the surveyor of the Walden mistakenly called for "its beginning corner"—reference being to the survey's northeast corner—to be upon the bank of the Sabine River.

The jury failed to find from a preponderance of the evidence: (1) that the surveyor of the Spears established the survey's southeast corner "where the line 27 to 30, as shown on Exhibit D-70," which line represents the undisputed south boundary of the Spears, intersected the river or the river's west bank, as the river was located when the survey was constructed; (2) that the surveyor of the McFarland established that survey's northeast corner on the river or on the river's west bank, as the river was located when the survey was constructed; (3) that the surveyor of the McFarland established the survey's southeast corner on the river or on the river's west bank, as the river was located when the survey was constructed; (4) that the suveyor of the Walden established that survey's northeast corner on the river or on the river's west bank, as the river was located when the survey was constructed; (5) that the surveyor of the Walden established the survey's southeast corner on the river or on the river's west bank, as the river was located when the survey was constructed; (6) that the surveyor of the Swift established that survey's northeast corner "where the line 3 to 7, as shown on Exhibit D-70," which line represents the defendants' location of the Swift's north boundary, intersected the river or the river's west bank,

as the river was located when the Swift was constructed; (7) that the surveyor of the Swift established the survey's southeast corner "where the line 2 to 1, as shown on Exhibit D-70," which line represents the defendants' location of the Swift's south boundary, intersected the river, as the river was located at the time at which the survey was constructed. The special issues by which such matters were submitted to the jury were all answered in the negative.

On such findings—none of which, it will be noted, pertained to lines as such—the trial court adjudged the southeast corner of the Spears Survey, the northeast and southeast corners of the McFarland Survey, the northeast and southeast corners of the Walden Survey, and the northeast corner of the Swift Survey to have been located originally where the plaintiffs claim the corners were located (uncircled numbers 30, 8, 7 on the plat), and further decreed that the plaintiffs, including the State, recover of and from the defendants, for the benefit of the Permanent Free School Fund of the State, in the proportions fixed in the judgment, title to and possession of the land that is represented by the shaded portion of the plat. The lines the plaintiffs ran as the eastern boundaries of the McFarland and Walden surveys were, as previously indicated, fixed by the judgment as the area's off-river boundary.

All of the jury's findings except those pertaining to the southeast corner of the Spears Survey are attacked on appeal as being contrary to the undisputed evidence, as being without support in the evidence, as being, in the alternative, without sufficient support in the evidence, and as being, in the further alternative, so contrary to the overwhelming preponderance of the evidence as to be manifestly wrong. And the judgment is itself similarly attacked. Points of error dealing with other matters are also contained in appellants' brief, but it is with the matters just mentioned that we shall principally, if not entirely, concern ourselves, since we have concluded that the points dealing with them are, for the most part, well taken.

The evidence is unusually voluminous but it must nonetheless be dealt with in considerable detail.

As a backdrop for the plaintiffs' vacancy claim there are these undisputed facts: (1) The area that the defendants claim is taken up by the Swift Survey and by the five surveys nearest the Swift on the north—the lower McFarland, the Walden, the John Pleasants, the Thomas Linox, and the James Gray—contains a marked excess in acreage over the aggregate of the acreage called for in the field notes of those surveys. (2) Despite the fact that at all pertinent times the course of the river by the alleged vacancy has been substantially the same as it is now, no meander lines which even remotely fit the river between the place at which the plaintiffs would locate the northeast corner of the Swift Survey and the southeast corner of the Walden Survey (uncircled number 7 on the plat) and the place at which the defendants would locate those corners (circled number 7 on the plat) were called for in the field notes of either the Swift or the Walden; the meander lines called for in the notes of the McFarland Survey, whether run from whichever of the debated locations one may choose for the McFarland's southeast corner or whether run in reverse from whichever of the debated locations one may choose for the survey's northeast corner, substantially fit the river for only very short distances, if at all; the land maps in the General Land Office and those of Newton County have consistently depicted the river as flowing generally southwest from the northeast corner of the Spears Survey to the southeast corner of the Swift Survey, and none of them has ever even approximated depicting the river's true course around the heel and foot of the so-called boot.

With the latter circumstances as a basis for arguing that the surveyor of the McFarland and the surveyor of the Walden were

both mistaken as to the river's true location, the plaintiffs would give to the various surveys constructions and locations that would leave approximately 440 acres of unsurveyed land next to the river and that would place in the McFarland, the Walden, and the John Pleasants most of the remainder of the excess acreage.

The defendants would themselves allocate most of the excess acreage to the Swift and the James Gray, the greater part of it, or approximately 888 acres, to the Gray. They would, of course, leave no unsurveyed land.

In addition to coursing the north line of the Swift—and therefore the south lines of the Gray, the Pleasants, and the Walden —more nearly east than would the defendants from the Swift's northwest corner, and in addition to locating (for the most part) the east lines of the McFarland and the Walden away from the river, the plaintiffs would locate the west lines of the Mc-Farland and the Walden, the east and west lines of the Pleasants and the Linox, and the east lines of the Gray considerably west of where the defendants would locate those lines. In fact, they would locate the Pleasants and the Linox altogether west of where the defendants would locate those surveys.

The plaintiffs would allocate to the Mc-Farland's north and south lines excesses of 743 and 724 varas, respectively, to the Walden's north line an excess of 1152 varas, to the Pleasants' north and south lines excesses of 112 varas, respectively, and to the Gray's north line an excess of 36 varas. They would give the north and south lines of the Linox and the south line of the Gray their called lengths, but would leave the south line of the Walden short of its called length by 142 varas.

With the river as the east boundary of the McFarland and of the Walden, and with the Swift's north line located as they claim it should be, the defendants would themselves construct the Walden, the Pleasants, and the Linox in substantial conformity to the field notes of those surveys, but they would leave the McFarland's north and south lines short of their called lengths by 485 and 497 varas, respectively, and they would place in the Gray's north and south lines excesses of 1865 and 1802 varas, respectively.

There is no dispute about the location of the James Gray's west boundary nor about the locations of the survey's western corners, unless slightly different locations are claimed for the more southerly of the two creek corners.

The construction that the defendants claim is proper for the Swift Survey places an excess of approximately 2,000 varas in the survey's north line but leaves the survey's south line short of its called length by approximately 308 varas. The plaintiffs would themselves construct the survey in such a manner as to render each of the mentioned lines excessive, but only slightly so—the north line, by 131 varas; the south, by 62 varas.

From where they and all of the defendants except Kirby Lumber Corporation claim the Swift's northwest corner is located, the plaintiffs would, as previously indicated, course the Swift's north line in such a way as to give it a more southerly location than the one the defendants claim, for it. They would course the Swift's west line more west of south from the survey's northwest corner than would the defendants, and would locate the survey's southwest corner approximately 645 varas slightly south of west from the location the defendants claim for that corner. They would locate the Swift's south line altogether south of where the defendants would locate the line.

Defendant Kirby Lumber Corporation would locate the Swift's northwest corner slightly southwest of where the other parties claim the corner is located, but the matter is not of importance in the present suit.

Except with reference to where the termini of the line or lines fall, there is no dispute of material consequence about the location or locations of the line or lines by

which the lower McFarland and the Linox are bounded on the south and by which the Walden and the Pleasants are bounded on the north.

Since a vacancy is no longer claimed to exist opposite the Spears, that survey and the three next west of it—the Corbet Stevens, the upper T. S. McFarland, and the Tiny Jenkins—are of concern only as they figure in the evidence touching the surveys south of them. Allowance being made for the controversy about where the northeast and southeast corners of the Spears were located originally, there is no dispute about the locations of any of the lines or corners of the four surveys.

The places at which appellants would locate survey corners are designated on the plat by circled numbers. Those at which appellees would locate the same corners are designated by like numbers, uncircled.

Needless to say, perhaps, there is no reason to suppose that any of the meander lines were ever even marked on the ground, and none of the other controversial lines or corners can be now identified by original markings or monuments. Therefore, and because of the age of the surveys, the evidence is circumstantial in nature, and many of the circumstances are products of the very extensive surveying to which each side resorted.

Except for those that apply to the lines of the Swift and to the meander lines, the original course calls for the lines of the surveys thus far mentioned do not figure prominently in the evidence. Nevertheless, we think it well to state that all of the north and south lines except three that are of no significance (the two westerly north lines of the upper McFarland and the north line of the Jenkins) were called to run either North 80° East or South 80° West, and that all of the east lines except that of the Jenkins and those of the surveys next to the river, as well as all of the west lines except those of the three most westerly surveys, and except the two most westerly ones of the upper McFarland, were called to run either North 10° West or South 10° East.

Each side charges the other with endeavoring to locate senior surveys from junior surveys, and so we mention that the surveys that are reflected by the plat were surveyed in the order and on the dates here indicated: the Spears, July 9, 1835; the Stevens, July 15, 1835; the Swift, August 24, 1835; the upper McFarland, May 30, 1838 (initial survey); the lower McFarland, June 30, 1838; the Walden, August 23–24, 1841; the Pleasants, November 9, 1841; the Linox, November 9, 1841; the Gray, December 19, 1841; the Jenkins, April 6, 1891.

The five surveys that make up the middle tier—the lower McFarland, the Walden, the Pleasants, the Linox, and the Gray—are therefore junior to three of the surveys immediately north of them (the Spears, the Stevens, and the upper McFarland) and to the Swift; and of themselves, the McFarland is the senior survey.

For what it is worth, we also mention at this point that not more than four of the surveys were constructed by any one surveyor. The Spears, the Stevens, and the Swift were surveyed by William McFarland; the upper McFarland was surveyed by C. S. Hunt; the lower McFarland, by A. I. Shelby; the Walden, the Pleasants, the Linox, and the Gray were surveyed by M. B. Lewis; and the Jenkins was surveyed by C. H. Howard.

Quite a number of surveys besides those we have mentioned figured in the evidence. but particular note need not be taken of them until later, if at all.

 All things considered, there is no room to doubt that, as an abstract matter, the surveyor of the lower McFarland—viz., A. I. Shelby—intended that survey to be bounded on the east by the river. Nor is there room to doubt that, as an abstract matter, M. B. Lewis, who surveyed the Walden, the Pleasants, the Linox, and the Gray, intended the Walden to be bounded on the east by the river and for the four surveys to take up all of the area left by the lower McFarland between the river and

the Gray's undisputed west boundary and between the Swift and the northern tier of surveys—the Spears, the Stevens, the upper McFarland, and the Jenkins. Nevertheless, if, as appellees claim, the surveyors actually established the lower McFarland's southeast corner and the Walden's northeast corner on some watercourse or body of water other than the river, and meandered such watercourse or body of water rather than the river, and if in their field notes they in fact mistakenly referred to such watercourse or body of water as the river, the watercourse or body of water on which the corners were established and that was meandered, and not the river, became the east boundary of each of the surveys. Koepsel v. Allen, 68 Tex. 446, 4 S.W. 856; New York & Texas Land Co. v. Thomson, 83 Tex. 169, 17 S.W. 920; Sanborn v. Gunter, 84 Tex. 273, 17 S.W. 117, 20 S.W. 72; Stafford v. King, 30 Tex. 257; Turner v. Smith, 122 Tex. 338, 61 S.W.2d 792; Goodson v. Fitzgerald, 40 Tex.Civ.App. 619, 90 S.W. 898; Id., Tex.Civ.App., 135 S.W. 696. And assuming such a state of facts and that the true boundary—the watercourse or body of water—has since disappeared, it would seem that, in the absence of some good reason for rejecting them, the true meander lines should be treated as the eastern boundaries of the two surveys. See 8 Am.Jur., Boundaries, § 31, pp. 767–8; 73 C.J.S. Public Lands § 32b, p. 683; State v. Arnim, Tex.Civ.App., 173 S.W.2d 503. In any event, we shall assume that to be the rule. However, the calls for the river are not to be lightly disregarded. They are of the highest order of calls and, other things being equal, must be given precedence over course and distance calls, even though this results in placing an appreciable excess of acreage in a survey. McCombs v. McKaughan, Tex.Civ.App., 195 S.W.2d 194, er. ref.; Stafford v. King, 30 Tex. 257; Freeman v. Mahoney, 57 Tex. 621. The burden of proving that the calls were erroneous rested, of course, on the plaintiffs. Freeman v. Mahoney, 57 Tex. 621; Moore v. Stewart, Tex., 7 S.W. 771.

 We have concluded that appellees failed to discharge their burden of proof. In fact, we have concluded that the trial court erred in overruling appellants' motion for instructed verdict and in overruling their motion for judgment non obstante veredicto; that there is no evidence to support any of the jury's affirmative findings except the one appertaining to the southeast corner of the Spears Survey; and that the evidence required affirmative answers to all of the special issues that were answered in the negative.

Since the claim of vacancy is rooted in the proposition that most of the river calls in the field notes of both the lower McFarland and the Walden were made through mistake, we first call attention to undisputed facts which render it virtually inconceivable that the surveyor of either survey was ignorant of the river's location and mistakenly referred in his field notes to some other watercourse or body of water as the river.

Not only was the river by all odds the most prominent watercourse in the area, an international boundary, navigable, an artery of commerce, and flowing continuously; but one of the only two or three ferry-boat landings for miles along its west bank was situated in the foot, if not in the toe, of the so-called boot, and a road extended from the landing to the town of Belgrade in the northeast corner of the Spears Survey. The surveyors can hardly have been ignorant of the fact that the river lay east of the road all the way from Belgrade to the ferry landing, yet appellees would have them mistaking for the river something which necessarily would have crossed the road and, in large part, lain west of it.

That at least the surveyor of the Walden made no such mistake is rather conclusively established by his field notes. They, the notes, reflect that 844 varas west of the river the survey's north line crossed "road to Belgrade," and there is little or no room to doubt that the road was the one that led from the ferry landing. The ferry road was the only "road to Belgrade" in the vi-

cinity in 1841 of which there is any history, and it is highly improbable that there was another. Moreover, it is still to be found at approximately the called distance from the river, its present distance being 884 varas. On the negative side, no road of any kind was found at a comparable distance west of where appellees would locate the Walden's northeast corner. The nearest, besides the ferry road, was more than 1900 varas west of that point—therefore more than 2500 varas west of the river—and its history is uncertain, there being evidence tending to show that the road had come into existence within comparatively recent years.

Even without the foregoing circumstances, however, credulity beyond the ordinary would be essential to acceptance of the theory that the surveyors mistook a slough or lake for the river. Under appellees' own theory of the case each of the surveyors was at least on the river at one corner of the survey he constructed, and so had an opportunity for visual comparison of the river and whatever he is supposed to have mistaken for it. It is hardly to be supposed that, with that advantage, either of them was unable under normal conditions to distinguish between the flowing river and a slough or lake, and there is no suggestion in the evidence that either survey was constructed under abnormal conditions. The McFarland having been surveyed June 30, 1838, and the Walden having been surveyed August 23-24, 1841, both were surveyed during what normally would have been dry seasons and when it is unlikely that there was high water to confuse or mislead either surveyor.

Circumstances against which those just discussed would not be conclusive on the question of mistake are not easy to visualize, but it is not necessary to say that they could not exist. Regardless of the matters already discussed, there is no evidence from which it reasonably may be inferred that the contested river calls in the field notes of either the lower McFarland or the Walden were made through mistake.

As we shall endeavor to demonstrate: No real significance, one way or the other, attaches to the fact that none of the land maps of Newton County correctly depicts the river as it is or as it was when the maps were made. The fact that neither the field notes of the Swift nor those of the Walden contain meander calls corresponding to the river's course around the foot of the so-called boot aids appellants' rather than appellees' theory of the case. The fact that the meander calls in none of the surveys fronting the river fit the present course of the river is not of pertinent significance. The surveying on which appellees rely is insupportable.

The neutral nature of the land maps is virtually self-evident. The maps are, at best, but plats of the field notes of the surveys they depict, and in depicting the river they only reflect the meander lines called for in the field notes of the surveys that front on the river. Therefore, and since meander calls corresponding to the river's course around the foot of the so-called boot were not contained in the field notes of either the Swift or the Walden, it is but natural that the river's true course in that vicinity has never been reflected by the maps. Moreover, the maps do not give the impression that the draftsmen seriously endeavored to map the river in strict conformity to the meander calls appearing in the field notes. Instead, they leave little or no room to doubt that only free-hand drawings of the river appear on them and that the drawings are only rough approximations of the river's course as outlined by the meander calls. The maps must also be appraised in the light of the influence the first among them (one made in 1839) apparently had on the makers of the later ones, and of the fact that the 1839 map, which is the one appellees most stress, was made before the Walden was surveyed.

It is almost as easy to demonstrate that appellants' theory of the case rather than appellees' is aided by the fact that neither the field notes of the Swift nor those of the Walden contain meander calls correspond-

ing to the river's course around the foot of the so-called boot.

Appellants' theory is aided because a logical explanation for the absence of such calls exists if, and only if, the Swift and the Walden are constructed as appellants would construct them.

The explanation is itself found in the manner in which the meander lines across the Swift were constructed.

Despite the crookedness of the river opposite the Swift, only four meander lines were called for in the notes of that survey; and three of these were so unusually long as to rule out any likelihood of their having been run on the ground. The lines were called to run from the survey's southeast corner N. 25 E. 150 varas; N. 57½ E. 1735 varas; N. 12 E. 1077 varas; N. 54½ E. 1725 varas.

Appellees' surveyor had no doubt that the lines were constructed by use of what he termed "parallel and right-angle offsets," and there was no dissent by appellants' surveyors.

The evidence sheds but little light on the surveying process to which reference was made, but we infer that the meander lines were constructed by use of a base line run northward on the ground from the survey's southeast corner or, as is more likely, by use of successive northward-thrusting base lines stemming from the survey's southeast corner; by surveying eastward from the base line or lines to the more prominent points of change in the river's course and to the survey's northeast corner; by platting all river points, including the survey's river corners, and connecting them by straight lines; and by then scaling the lines for course and distance.

So constructed, the meander lines, at least in theory, roughly averaged out the river's course and placed on the survey's side of the lines areas of river comparable to the land areas left between the lines and the river. In other words, they are calculated to have supplied approximately the same basis for calculating acreage as would have been supplied by actual meander lines. And gaining knowledge from which to compute acreage is perhaps the most important reason for running meander lines, since the thing meandered, not the meander lines themselves, is the boundary. McCombs v. McKaughan, Tex.Civ.App., 195 S.W.2d 194, er. ref.; State v. Atlantic Oil Producing Co., Tex.Civ.App., 110 S.W.2d 953, error refused.

Meandering the river around the foot of the so-called boot would have been incompatible with the method by which the meander lines across the Swift were constructed. Failure to do so is therefore no basis for excluding "boot" land from the survey. Nor is it any indication that the surveyor was unaware of the river's true location.

In order to demonstrate that the fact that the meander calls in the field notes of the lower McFarland and of the Walden do not fit the present course of the river is of no probative force to prove that the calls were made through mistake, it is only necessary to mention other facts. Although the course of the river is now substantially as it was in 1838 and in 1841, it is not exactly the same, and there is no way of knowing just what it was at any given point during either of those years. There is evidence to show that the river has since moved to and fro opposite the Spears; that in places it has moved eastward opposite the McFarland and the Walden; and that it has moved westward opposite the lower part of the Swift. And, in the very nature of things, it is reasonable to assume that there have been changes, of varying degree, all along its course. In addition, according to all of the evidence, it was not customary in early times for surveyors to meander rivers, streams, or lakes closely. Appellees' own surveyor cited one instance in which the meander lines had been run a half mile from the meandered object. Then, too, it was not uncommon, according to the evidence, for meander lines to be constructed by means of the method employed in constructing these across the Swift Survey.

All things considered, therefore, it would be a startling coincidence if the meander calls in the notes of the McFarland and of the Walden did in fact coincide with the present course of the river.

As a prelude to discussing the surveying, it is perhaps well to recall attention to the fact that the evidence touching the numerous surveys and their lines and corners is ultimately of importance only as it bears upon the true locations of the Swift's north line and of the Walden's and the lower McFarland's east lines, because the locations of these lines resolve the question of whether the area in the so-called boot—the shaded portion of the plat—is or is not vacant and unsurveyed land. And we add that, to an extent, but only to the extent that clarity requires, the ensuing and more detailed discussion of the evidence will be repetitious of what has been said previously in contrasting the constructions and locations the respective parties would give the various surveys. The evidence touching the Swift Survey will be dealt with first.

The field notes of the Swift call to begin at the survey's southeast corner and to go with the meanders of the river to the survey's northeast corner; thence S. 80 W. 10,000 varas to the survey's northwest corner; thence S. 46 W. 4,380 varas to the survey's southwest corner; thence N. 80 E. 10,000 varas to the place of beginning. The meanders of the river are represented as having been those hereinabove discussed. And the north line is represented as having crossed Big Cow Creek 9,690 varas from the survey's northeast corner. A plat of the survey was filed with the field notes and is here reproduced:

When the meander lines are run in reverse from what appellants claim as the Swift's northeast corner (circled number 7 on the plat), they are mostly on the Louisiana side of the river. The first of the lines (reversed order) crosses the lower part of the "boot" but also crosses the river north of the toe of the "boot" and extends on into

Louisiana for some distance. The three remaining lines are altogether in Louisiana. And in order to intercept the last of them (reversed order) with the Swift's south line as run by appellants, it would be necessary to project the latter line approximately 2,333 varas from its river terminus.

If a point 9,690 varas from Big Cow Creek is selected in the Swift's north line as run by appellants, and the meander lines are run in reverse from it, the first of the meander lines (reversed order) is altogether west of the "boot" but still crosses the river and extends well into Louisiana, and the three remaining lines continue to be well inside Louisiana. However, in order to intercept the last of them (reversed order) with the Swift's south line as run by appellants, it would only be necessary to project the latter line some 375 or 400 varas from its river terminus.

When the meander lines are run in their called order from what appellants claim as the Swift's southeast corner, (circled number 1 on the plat) the first three of them lie either in or across the river, and the fourth, or last one, intercepts what appellants claim as the Swift's north line at a point more than 2300 varas from the north line's river terminus.

If in all three instances the called course of the Swift's north line were to be permitted to control location of that line and the northern termini of the meander lines, the results would be essentially the same as those we have outlined.

Appellees rely heavily on the foregoing facts, but we are unable to see that they are aided by them. It must be conceded, of course, that the meander calls are erroneous if appellants' construction of the survey is correct, but they are likewise erroneous if appellees' construction of it is correct.

If the meander lines are run on true course from what appellees themselves claim as the Swift's southeast corner, they fit the river little, if any, better than when run from what appellants claim as the survey's southeast corner, and they lack much of contacting what appellees claim as the Swift's northeast corner. What appellees claim as the Swift's north line is, in such circumstances, intercepted considerably more than 600 varas S. 80° 47' W. of where appellees terminate it, and a corresponding distance less than 9,690 varas N. 80° 47' E. of Big Cow Creek; and this, despite the fact that the river has been moving westward, if at all. Clearly, therefore, if the Swift's southeast corner is situated where appellees claim it is, and if its location has remained cónstant, as appellees claim it has, the surveyor made a mistake in his meander calls.

The meander calls being erroneous in any event, such advantage as this affords would seem to lie with the side in whose favor the surveyor's mistake can be most plausibly explained. And we feel that the advantage, if any, is with appellants. No plausible explanation of the mistake that would be involved under appellees' construction of the survey suggests itself. On the other hand, mistakes which may well have been made if the survey was constructed as appellants claim it was, and which would explain not only the meander calls—but the excess in the Swift's north line as run by appellants, do readily suggest themselves.

There is a distinct possibility—even a probability—that there should have been five meander calls instead of four. And the manner in which the survey's north line was likely measured may well have led to omission of the measurements along one segment of the line when the measurements were totalled.

Assuming the previously-discussed surveying process to have been used in a normal manner and in keeping with our understanding of it in constructing the meander lines, a new northward-thrusting base line was run from each successive river point. The last of these lines would therefore have intersected the survey's north line considerably east of the survey's southeast corner but west of the survey's northeast

corner. Measurement would then have been made eastward from the point of intersection to the northeast corner, whereas the remainder of the Swift's north line was measured westward. It is easy to visualize the surveyor as having failed, through oversight, to add the eastward measurements to the westward measurements when he computed the line's total length. Especially so, since the eastward measurements were primarily made for the special and limited purpose of establishing meander lines. It is likewise easy to visualize such a mistake as having led to a mistake in the meander lines also, since the latter were arrived at by platting.

Of course, in order for the eastward measurements to correspond to the excess in the Swift's north line under appellants' construction of the survey, the last of the base lines would have had to intercept the north line 10,000 varas from the survey's northwest corner; which, according to the field notes, would have placed the intersection point 9,690 varas from Big Cow Creek. And in order for the last of the base lines to have intercepted the north line at the proper place, a river point which was not mentioned in the field notes—i. e., an additional river point—would have been necessary. But if the Swift's north line was in fact run where appellants claim it was, or even where the surveyor said he ran it, there is a strong likelihood that an additional and unmentioned river point was established on or near the crest of the river bend on which appellees would themselves locate the Swift's northeast corner. Certainly the prominence of the bend was such as to have invited, if not to have required, establishment of such a base point. And a point at a distance of 9,690 varas from Big Cow Creek in the Swift's north line as run by appellants or in the line as the surveyor said he himself ran it would have been almost directly above the crest of the river bend.

Assuming the Swift's north line to have been run as appellants claim it was, or even as the surveyor said it was, and that a river point was in fact established on the above-mentioned river bend, a fifth meander call should have been included in the field notes. And if in fact it should have been, a plausible explanation for its omission, as well as for the failure to mention the river point, is available; provided the surveyor did in fact fail to add eastward measurements to westward measurements when he computed the length of the Swift's north line.

As previously mentioned, the meander lines were arrived at by platting. However, it is highly improbable that they were platted until after the other lines of the survey had been drawn. In which event, and assuming the north line to have been drawn shorter than it should have been, due to omission of that segment of it that would have called for the fifth meander line, it is quite understandable that the draftsman may have lost sight of the fifth meander line and closed his plat and the survey with the fourth meander line—when the latter should have been run to the next river point.

Appellees do not claim that there is evidence—nor is there any—to justify locating the Swift's northeast corner away from the river. With reference to that corner, therefore, the only problem is that of where on the river the corner is located. By the same token, the only problem with reference to the Swift's north line is that of how properly to course the line from the survey's accepted northwest corner.

Neither side deems it proper to run the Swift's north line in strict accordance with the line's called course; but if the line were so run from the Swift's accepted northwest corner, it still would be essentially as beneficial to appellants and as hurtful to appellees as when run as appellants run it. The line, for the most part, would run slightly south of where appellants locate it, but north of where appellees locate it, and north of the river bend on which appellees would locate the Swift's northeast corner. In other words, it would pass north of the river bend and across the alleged vacancy,

and would still leave most of the alleged vacant land in the Swift.

The field notes would place the Swift's northwest corner S. 80 W. 310 varas from Big Cow Creek. What appellees and all of the appellants except Kirby Lumber Corporation accept as the survey's northwest corner was found by appellees to be S. 80 W. 456.4 varas from the creek. From such point, as best we can tell, appellants ran the Swift's north line on called course, or N. 80 E., to the creek. They then dropped southward down the creek approximately forty varas, and from there ran N. 79° 37′ E. 6,133.75 varas, and then, from the latter point, N. 78° 57′ E. 5,326.2 varas to the river. Appellees, on the other hand, ran the line from the northwest corner N. 80° 47′ E. 10,131 varas to the river. The distance from Big Cow Creek to the river was only 9,674.6 varas. Kirby Lumber Corporation differs with the other appellants only about that part of the line west of the creek. Instead of breaking the line at the creek, Kirby projected along its reverse course to the survey's west line as ran by appellants that segment of the north line that appellants ran N. 79° 37′ E. from the creek. The point of intersection is approximately 85 varas S. 46° 13′ W. of where the other parties locate the northwest corner.

As against the call for the Swift's west line to run S. 46 W. 4,380 varas from the survey's northwest corner, appellants ran the line from the generally accepted northwest corner S. 46° 13′ W., or only 13′ off course, 4,383.08 varas. And from the point thus arrived at, they ran the survey's south line N. 80° 9′ E., or only 9′ off course, 9,-692.85 varas to the river. Appellees, on the other hand, when their actual calls are reversed, ran the west line from the accepted northwest corner S. 50° 11′ W., or 4° 11′ off course, 4,933.5 varas (an excess of 553.5 varas), and the south line, from the point thus arrived at, N. 81° 02′ E., or 1° 02′ off course, 10,062 varas to what they claim as the survey's southeast corner.

In large degree, appellants and appellees approached reconstruction of the Swift from opposite poles. Appellants sought to establish lines and have them control corners. Appellees, on the other hand, sought to establish corners and have them control the courses of lines.

The lines on which appellants rely are marked, and there is a plethora of evidence to show that they—or lines in their immediate vicinities—have been marked since time immemorial. There is the same amplitude of evidence to show that the lines—or lines in their immediate vicinities—have been consistently recognized and accepted by owners, occupants, surveyors and others as the lines of the Swift Survey. Detailing the evidence would be pointless, because there is no conflicting evidence.

Appellees are the first, of whom there is any history, who have claimed as boundaries of the Swift the lines on which they themselves rely. And not even they did so prior to trial of the case. During the hearing before the Commissioner of the General Land Office they were in accord with appellants about the lines and corners of the survey, except with reference to the course of the north line from the survey's accepted northwest corner, and except with reference to the location of the north line's eastern terminus. And even the course they then claimed for the north line—N. 79° 30′ E. from the accepted northwest corner—was accounted for by much the same markings as those on which appellants rely for establishment of the line.

In the latter connection it may be said that, within narrow limits, there is perhaps room for bona fide disagreement about the proper interpretation of the markings that exist. Unless it is accepted that a single line has been widely marked, two marked lines, rather close together, exist along a portion of the course appellants claim for the north line. And appellants favor the more northerly markings.

The material difference between appellees' and appellants' claims before the Commissioner was that appellees claimed that the north line's eastern terminus, or the

Swift's northeast corner, should be established 9,690 varas N. 79° 30' E. of Big Cow Creek rather than on the river, and that the survey should be closed by running the meander lines in reverse from that point to the river.

Following the hearing before the Commissioner appellees employed a different surveyor from the one on whose testimony they relied during that hearing, and the new surveyor, W. W. Dubose, developed their present theories regarding the Swift. But even he was compelled by truth to admit that, throughout his own rather long familiarity with the survey, the lines on which appellants rely—or lines in their immediate vicinities—had been marked and had been recognized and accepted as the Swift's boundaries.

As early as 1937 or 1939—just which is not clear—Mr. Dubose, who was then employed by one of the owners of the Swift, ran a "transit line" around the survey. We take it that he ran the true course calls for the south, west, and north lines of the survey from what he accepted as the southeast, southwest, and northwest corners of the survey. His findings with reference to markings along the lines as he ran them at that time were in keeping with appellants' present claims regarding the lines' markings. And as a witness in two or more lawsuits which followed his running of the "transit line," Mr. Dubose took the position that the Swift's boundaries were essentially as appellants claim them to be.

We incline toward the belief that nothing short of original markings could justify departures from lines and corners so long recognized and accepted. But the complete lack of merit in the circumstances by which appellees have undertaken to justify departures renders it unnecessary that we commit ourselves to such a principle.

It is to be noted that, at least in appearance, the first of the above plats depicts Big Cow Creek as forking near the river and as having two mouths. And the representation is, in a sense, correct. Moreover, it appears that both channels have existed since before the Swift was constructed. However, the more northerly of the two is the creek's true or regular channel— through which water flows into the river continuously. The other is known as "Cow-Creek Cut-off." And there is no history of its ever having been known as anything else. Creek water flows through it only when the creek's flow is from three to four feet or more above normal depth.

Appellees claim a marked corner on the "cut-off" as the Swift's southeast corner. And the location is of the utmost importance to their theory of the case, because it is a controlling factor in their location of the Swift's north line.

Beginning at such point, appellees' surveyor first ran what appellees claim as the Swift's south and west lines. He then returned to his beginning point and from there ran his own adaptation of the meander lines. And finally he ran the north line from the survey's accepted northwest corner to the river on a course that would cause it to contact the north end of the fourth, or last, meander line. He claimed no other reason for having coursed the north line as he did, but did claim that he found some marked trees on and near the course he pursued. One of these was approximately 300 varas S. 80° 47' W. of the meander-line point, but most of them were along the western one-third or one-half of the line, principally in the vicinity of Big Cow Creek, and the surveyor did not deny that those were also on and along the course appellants claim for the north line.

For the Swift's south line appellees' surveyor ran a straight line from his beginning point to where a passing call in the field notes of a junior survey which in part was built to the Swift's south line would place the Swift's southwest corner. From there he ran a straight line to the Swift's generally accepted northwest corner. From his beginning point, he ran each of the meander lines one degree east of its called course. So run, the meander lines carried

to a point which is represented on the plat by uncircled number 7a. By the most direct route, the point is approximately 20 varas from the river bank. But when coursed as appellees course it, the Swift's north line passes north of the nearest river point and strikes higher on the river bend, slightly short of 600 varas N. 80° 47′ E. from the meander-line point. Having found the latter point to be 600 varas less than 9,690 varas from Big Cow Creek, the surveyor ran the north line past it and to the river; that is, to the point that is represented on the plat by uncircled number 7. The two points are actually 584.6 varas apart. The fourth, or last, of the meander lines was then coursed still more east of its called course and made to contact the terminus of the north line. As thus run, the meander line ran N. 61° 27′ E. 2, 348.96 varas, whereas the field notes called for it to run N. 54½ E. 1,725 varas.

Had the meander lines been run on their called courses instead of as they were run, and still allowed to control the course of the survey's north line, they would have pulled the north line southward from where appellees locate it and into the river some 600 or more varas short of the line's called length east of Big Cow Creek. And had they been run on their called courses and the last of them projected to an intersection with the north line as run by appellees, the intersection would have occurred approximately 100 varas S. 80° 47′ W. of where it did occur.

The explanation given by the surveyor for his having initially run the meander lines one degree east of their called courses was that he had concluded, from his own coursing of the Swift's south line, that the original surveyor of the Swift had run the lines of the survey approximately one degree "to the right" of their recorded courses. He gave no reason for his failure to take into account in this respect the fact that he himself had run the Swift's west line 4° 11′ off its called course.

If appellees' location of the Swift's southeast corner and their coursing of the survey's south line were to be accepted as correct, it is highly improbable that even then there would be evidence to support their locations of the survey's north line and northeast corner. The following questions would require answers, and we think it unlikely that an affirmative answer to either would be proper: 1) Was running each of the meander lines one degree east of its called course justified by the mere fact that originally—as would be true in the hypothetical situation—the south line was run one degree "to the right" of its recorded course? 2) Even so, was it proper to give the meander calls precedence over the north line's called course?

The questions are pertinent, of course, to any appraisal of appellees' claims, but, being of the opinion that appellees' location of the Swift's southeast corner and their coursing of the survey's south line must be rejected, we refrain from actually deciding either of them.

The original plat of the Swift, as will have been observed, does these things: depicts Big Cow Creek as having had only one channel; depicts the Swift's south line as having contacted the creek at the most southerly point of the creek's course, not far west of the river; depicts the creek's eastward course from the point of contact as having been first northeast for a considerable distance and then southeast to the river; depicts the Swift's southeast corner as having been slightly below the mouth of the Creek.

Just how far below the mouth of the creek the corner was is not known, but the distance must have been considerably less than 150 varas, since the first of the meander lines was called to run only 150 varas N. 25 E. from the corner, and would appear to have carried to a point considerably above the creek's mouth.

The other of the plats, as also will have been observed, does the following things: depicts the south line as run by appellants as touching or virtually touching the creek

at the most southerly point of the creek's course west of the cut-off, as crossing the cut-off, and as intercepting the river quite a distance below the mouth of the creek; depicts the regular channel of the creek as approaching and reaching the river on an ascending course; depicts the cut-off as proceeding to the river along a descending course; depicts the south line as run by appellees as lying quite a distance south of the most southerly point of the creek's regular channel and as terminating at the south edge of what appellees claim is the mouth of the cut-off.

The location appellants claim for the Swift's southeast corner is actually about 250 varas below the creek's mouth. It is also about 209 varas from the location appellees claim for the corner. And the south line as run by appellees is near 200 varas south of the most southerly point of the creek's regular channel.

Appellees pick and choose from the foregoing facts. But before examining their argument, it is well to state additional facts, from which they also pick and choose.

The Swift was twice partitioned, once in 1857, and again in 1881. Both field notes and a plat of the 1857 partition were prepared and are in evidence. Only field notes of the 1881 partition have come to our attention. There is hardly room to doubt that the field notes and plat of the 1857 partition were products of an office survey, but it is undisputed that the partition lines were subsequently run on the ground. How well the field notes fitted the ground in the vicinity of the river is not known. There is no reason to doubt that the field notes of the 1881 partition were products of a ground survey.

In the 1857 partition, an 1161-acre tract was partitioned to Seth Swift, and a 473-acre tract was partitioned to Sarah G. Miles. The field notes of the 1161-acre tract called to begin at the Swift's southeast corner and to run N. 10 W. 400 varas. From there the north lines carried to the Swift's west boundary. The Swift's west

and south lines were then followed back to the beginning point. The 473-acre tract lay adjacent to the 1161-acre tract and to the river. Its field notes also called to begin and close at the Swift's southeast corner. And the plat, as it naturally would, showed a wedge of the 473-acre tract between the east end of the 1161-acre tract and the river. The east line of the 1161-acre tract was not depicted as crossing Big Cow Creek except at the line's south end.

In the 1881 partition, 320 acres off the east end of the 1161-acre tract were partitioned to Paul G. Swift. The field notes called to begin at the Swift's southeast corner, to run first with the south line, and finally to run S. 10 E. 400 varas to the place of beginning. The latter, or east, line was represented as having intercepted Big Cow Creek at a distance of five varas from the line's north end.

In 1850 the Henry W. Sudduth Survey was built to the Swift's southeast corner and to the east 6032.7 varas of the Swift's south line. And in 1852 Seth Swift purchased 30½ acres in the survey's northeast corner. The field notes of the tract called to begin at a stake "on the margin of the swamp of Sabine River" and to run from there "up the said River swamp" N. 22° 30' E. 52½ poles to the Swift's southeast corner, thence S. 80 W. 184 poles, thence S. 10 E. 20 poles, thence N. 87° 30' E. 148½ poles to the place of beginning. Only the southeast and northeast corners were represented as being marked otherwise than by a stake.

Claiming that an endorsement which appears on the back of the original plat of the Swift shows the survey's southeast corner to have been established originally at "the confluent point" of the creek and river, appellees attempt to make capital of the fact that the corner location claimed by appellants is 250 varas below the mouth of the creek and almost as far above the mouth of the cut-off. The endorsement is as follows: "Plat of One Sitio of land at

the confluent point of Cow Creek with the Sabine River for Seth Swift, Esquire." We reject both their interpretation of the endorsement and their contention that the location they themselves claim for the corner is at "the confluent point" of the creek and river. The endorsement merely identified the plat and the area of the land's location. The location they, the appellees, claim for the southeast corner is one hundred or more varas from the river. Appellees would have it that the location is at the place where the cut-off formerly emptied into the river, but there is no evidence that what they refer to as the "old course of the river" has ever been the river's course. Appellees' own surveyor referred to it more often than not as "the old lake." Appellants say that it is neither an old river channel nor an old lake, but merely a widening of the channel of the cut-off.

Appellees also attempt to make capital of the fact that the original plat of the Swift depicts Big Cow Creek as reaching the river on a descending course, of the fact that the plat of the 1857 partition shows a wedge of the Sarah Miles 473-acre tract between the river and the Seth Swift 1161-acre tract, and of the fact that the east line of the 320 acres partitioned to Paul G. Swift in 1881 was represented as having intercepted Big Cow Creek only five varas from the line's north end. They say that none of these things is true as appellants locate the Swift's south line, and that all of them are true or substantially so as they themselves locate the line. But they ignore facts which establish beyond question that, in referring to the creek, the partition field notes referred to the creek's regular channel, not to the cut-off. For example, they ignore the fact that all of the partition corners that still exist, which appears to be most of them, are admittedly either on or inside the lines appellants claim for the Swift; and they ignore the fact that the plat of the 1857 partition depicted the east line of the 1161-acre tract—which later became the east line of the 320-acre tract—as

crossing the creek only at the line's south end. They also ignore the evidence which shows conclusively that opposite the Swift the river has been gradually but steadily moving westward for many years. And this westward movement explains both the creek call in the east line of the 320 acres set aside to Paul G. Swift in 1881 and the fact that the creek now arrives at the river on an ascending course. By 1881, as is sufficiently evident, the river had already moved to or near the crest of the northward bend of the creek that is reflected by the original plat, thereby placing the Swift's southeast corner 395 varas below the north edge of the creek. It has since moved west of the crest, thereby reducing the distance from the creek to the south line and causing the creek to approach it on an ascending course. The north and south lines of the 320-acre tract are admittedly now short of their called lengths.

Appellees attempted, but failed, to prove that the corner on the cut-off is the northeast corner of the 30½ acres, therefore the southeast corner of the Swift. From such corner, their surveyor ran the courses and distances called for in the field notes of the 30½ acres, except that he ran the north line with what appellees claim as the Swift's south line, or 1° 02′ off its called course. No line markings of any kind were found along the lines he ran, nor were any corner markings found at either the northwest corner or the southwest corner. The surveyor did claim to have found an old corner or evidence of an old corner at the east end of the south line, but he did not, so far as we are aware, disclose what it was that led him to believe that it was a corner site. In any event, he did not, except by vague implication, identify the corner as the southeast corner of the 30½ acres. Definite identification of the corner is the only thing that would have enabled his surveying to lend support to appellees' claims regarding the corner on the cut-off. The mere fact that by running the called course and distance for the east line he returned to his

beginning point is not significant. Assuming the correctness of the field notes, a course-and-distance survey could not have done otherwise than return him to his beginning point, unless because he ran the north line slightly off its called course.

If the 30½ acres were in fact located as appellees claim, the southern end of the tract would be opposite an old ferry crossing on the river. Appellees profess to find in this fact support for locating the tract as they did, their argument being that Seth Swift purchased the 30½ acres in order to have a place from which to operate the ferry. Not only is there no evidence to show for what purpose the land was purchased, but the argument overlooks the fact that even as appellees would locate it the 30½ acres would have been far removed westerly from the ferry crossing.

No support for appellees' location of the Swift's southeast corner is found in what they claim as the Swift's south line. The line was coursed as it was only because of the locations appellees claim for the survey's southeast and southwest corners. No markings of any kind were found anywhere along it except at its east end.

Much evidence was devoted to the location of the Swift's southwest corner, but it is all immaterial. The only advantage to appellees in using the location they did instead of the recognized and accepted corner was that it reduced and rendered slightly less unpalatable the degree to which the Swift's south line as run by them departed from the line's called course.

In explanation of the marked corner appellees claim as the Swift's southeast corner, it is only fair to state that the evidence rather conclusively shows that, instead of being the northeast corner of the 30½ acres, the corner is in fact the southeast corner of that tract, as relocated and marked by surveyor James G. Barker in 1930. Admissions made by appellees' own surveyor inescapably lead to this conclusion. At least one judgment in a suit between owners and claimants of the Swift and Sudduth and of the 30½ acres would so label it. And there is much other evidence to the same effect, but no good purpose would be served by detailing and discussing it.

There being no evidence to support appellees' locations of the Swift's south line and southeast corner, there is none to support their meander lines nor their locations of the survey's north line and northeast corner. If the matter rested here, the north line would be controlled by its called course. But there is ample evidence to support appellants' locations of the north line and northeast corner, and it must be given effect.

Appellees do not claim that there is evidence—nor is there any—to justify separating the Walden's southeast corner from the Swift's northeast corner. Both corners and the common boundary of the two surveys must therefore be given the locations appellants claim for them. And when this is done, we think it clear that the river call for the Walden's northeast corner must also be honored. The surveyor said he began on the river and went with the meanders of the river to the Swift's northeast corner. And since he did arrive at the latter corner, there is no reason to doubt that his starting point was on the river. Moreover, when the meander calls are run from what appellants claim as the Walden's northeast corner, they pass just east of the location appellants claim for the survey's southeast corner. They are too long and probably extend to the Louisiana side of the river, but it is quite possible that through the years and through remarkings the Swift's north line has moved northward somewhat. It is also quite possible that the river's course has changed somewhat. The meander lines also indicate a westward bulge in the river which no longer exists, but maps of the river itself show that in earlier days there was a westward bulge or curve in the river to account for the meander calls. When the meander calls are run from what appellees claim as

the Walden's northeast corner they never reach the river. In fact, they do not come close to doing so, being far west of the river all the way. Given the construction appellants claim for it, the Walden conforms closely to its field notes and to the plat the original surveyor of it prepared for it. On the whole of the evidence, therefore, we have no hesitancy in saying that, as a matter of law, the lines and corners of the Walden are as appellants claim them to be.

We take it that, under the portion of the judgment from which there has been no appeal, the southeast corner of the Spears and the northeast corner of the lower McFarland are now established at the location appellants claim for them (circled number 30 on the plat). But the jury found that the southeast corner of the Spears was established originally where appellees claim it was (uncircled number 30 on the plat), and we shall treat it as having been so established, no attack having been made on the finding. Appellees claim that the McFarland's northeast corner was established originally at the same location, and it is true that the field notes of the McFarland call to begin at the southeast corner of the Spears. We doubt that the surveyor of the McFarland began or closed the survey at such location, but the matter is not of too much importance. It is but an evidentiary matter, of significance only as it bears upon the true location of the McFarland's southeast corner. And even if the northeast corner was located originally as appellees claim, there is no evidence to justify locating the southeast corner away from the river.

It appears that a survey embracing the area now taken up by the middle tier of surveys—the lower McFarland, the Walden, the Pleasants, the Linox, and the Gray—was once made for a William Hines. The survey was abandoned and its field notes are no longer available, but they were likely available to the surveyors of the surveys within and north of the abandoned survey. In any event, the north line and corners of the Hines were referred to in the field notes of some, if not all, of the surveys touching that line. For example, the initial call in the field notes of the Spears is as follows: "Beginning at Post & mound (being the upper corner of Wm. Hines' Survey, on the bank of the Sabine) where a Holly 8 In diam.—bears N 19° W 6%o varas and a red oak 50 In diam. bears S 45° W 8%o varas." As initially written, the opening call in the field notes of the lower McFarland was as follows: "Beginning at the Upper Corner of a Survey made for Wm. Hynes being the Lower corner of a Survey made for John Spear—a Stake from which a Large red oak marked W H bears S 20° E 6 varas and holly marked W H. bear S 80° W 4 varas." A line was subsequently run through the words, "Upper Corner of a Survey made for Wm. Hynes, being the." In final form, therefore, omitting the words through which the line was drawn, the field notes were as follows:

"Survey for Ths. S. McFarland of Eight Labors. 149,836-sqr varas of Land Situated in Newton County on the West-bank of the Sabine river 2 miles below the Town of Belgrade and 3 miles above the mouth of Big Cow Creek. Being the excess of the Quantity of land to which he is Entitled by virtue of Certificate No. 421 Issued by the board of Land Comrs for the County of San Augustine—Beginning at the Lower corner of a Survey made for John Spear.— a Stake from which a Large red oak marked W H bears S 20° E 6 varas and holly marked W H. bear S 80° W 4 varas— Thence S 80° W on Said Spear's South boundary at 3000—varas pine oak & dogwood Land at 3,900 Creek 6 varas wide runs S E at 4257 varas passed T. S. McFarland SE-Corner 5,644¾o varas a Stake from which a white oak marked TM bears S 80° E 5¼o varas and a chinquepin mkd T.M. bear N 5 W. 1%o vrs . . . Thence S. 10° E—at 1444. %o varas a Stake from which a hickory Marked T.M. bear N 55° W. 3%o varas and a gum marked TM— bear N 83° W 2%o varas—Thence N. 80⁴ E at 1500 varas Gum line tree at 3000 varas

Cain at 5600⅒ varas a stake on the West bank of river Sabine from which a holly marked TM—bear S 46° W 4²⁄₁₀ varas and a gum marked T.M.—bear N 70° E 5⁴⁄₁₀ varas Thence Up Sabine River with its meanders Viz 1st N. 5° W. 850 varas—N 19° E—220 varas N 59° W 300 varas N 16° E 255 varas—Place of beginning 3 labors Temporal or Areable lands—Residue pasture land—30th June 1838."

Even if located originally as appellees claim it was, the McFarland's northeast corner, as appellees concede, was on the river, as the river then ran. And the evidence by which appellees sought to prove that the surveyor failed to get back to the river with his south line is without probative force for that purpose. It consists of little, if anything, besides the fact that when run in reverse from the claimed northeast corner location the meander lines lead to a marked corner on an old slough—slightly north of what appellants claim as the survey's south line and also slightly short of the called length of the meander lines— and of the fact that one witness testified that when a child he was told by his father that the marked corner was the southeast corner of the McFarland.

Against such evidence there are the following things, among others: 1) the river calls; 2) the fact that, only three years after the McFarland was surveyed, the surveyor of the Walden, who, as we have shown, unquestionably began the Walden on the river, said he began it at the McFarland's southeast corner; 3) undisputed evidence showing the McFarland's south line to have been marked all the way to the river since before the turn of the century; 4) undisputed evidence showing the marked line to the river as having been recognized and accepted as the common boundary of the McFarland and Walden since time immemorial; 5) the fact that, when run from the river location appellants claim for the southeast corner, the meander lines do connect such point and the point appellants claim for the McFarland's northeast corner, though they do not fit the river's course at

all; 6) the purpose for which the corner on the slough was marked is not known.

All things considered, the lengths of the McFarland's north and south lines and the location of the survey's west line are not really matters of importance. However, appellants offer plausible explanations for the shortages they give the north and south lines (485 and 497 varas, respectively). On the other hand, appellees are unable to give any plausible explanation for the excesses they give the lines (743 and 724 varas, respectively). Appellees actually have no justification for the excesses except that course and distance calls in junior surveys, when run from the west, would place the McFarland's west line far west of the location appellants claim for it.

Both sides offered evidence to the effect that A. I. Shelby, who surveyed the lower McFarland, had been found to have been not only a careless surveyor but one who was prone to copy from other field notes. When he surveyed the lower McFarland, there would have been available to him the field notes of the Spears, Stevens, and upper McFarland, and possibly—perhaps probably—the field notes of the Hines abandoned survey. In his north line he called to pass the upper McFarland's southeast corner at a distance of 4,257 varas from his beginning point. The upper McFarland's southeast corner is undisputed and is considerably less than 4,257 varas from either of the locations claimed for the southeast corner of the Spears. That is actually the combined called lengths of the north lines of the Spears and Stevens. And in the field notes of the upper McFarland there was initially this entry: "Survey for Thomas S. McFarland of Eleven Labors * * * of land situated in Newton County 4,257 varas S. 80° W from the bank of the Sabine River." A part of this, "4,257 varas S. 80° W. from the bank of," was then lined out and the following substituted, "3 miles west of." The location appellants claim for the lower McFarland's northwest corner is actually 1387 varas from the upper McFarland's accepted southeast corner.

And when this sum is added to 4,257, we have the total of 5,644 varas, as against the called length of 5,644½0 varas for the lower McFarland's north line. The upper McFarland had been surveyed and its southeast corner marked only thirty days before the lower McFarland was surveyed. And appellants logically argue that, instead of beginning his work at the southeast corner of the Spears, Shelby, surveyor of the lower McFarland, actually began at the freshly marked southeast corner of the upper McFarland and only measured from there to the lower McFarland's northwest corner, and that to this distance he added the 4,257 varas, under the erroneous impression that it was the distance of the upper McFarland's southeast corner from the river. Appellees' surveyor conceded that this was probably the way Shelby arrived at the length he gave the lower McFarland's north line. Shelby called the lower McFarland's south line to be 5600 varas long. Just three years later the surveyor of the Walden and Pleasants found the distance to be 5060 varas. Appellants suggest that Shelby inadvertently transposed the six and a zero in writing up his field notes. It seems rather certain that this occurred, because, while we shall not enter into a discussion of the evidence, appellants have done a very creditable job of connecting their claimed locations of the lower McFarland's northwest and southwest corners back to original markings; and their location of the southwest corner is 5,030 varas from their location of the survey's southeast corner. A comparison will disclose that the surveyor of the Spears and the surveyor of the lower McFarland did not call for the same bearing trees at the Spears' southeast and the McFarland's northeast corner, hence the doubt we expressed earlier about their having been at the same location.

In 1951 Kirby Lumber Corporation acquired from the State a deed of acquittance to the James Gray, bounding the latter as they claim it to be bounded, and inferentially confirming appellants' constructions of the other surveys with which we have dealt.

Appellants say that by virtue of said deed the State is estopped to take the position it now takes. The holdings already made render it unnecessary that we decide the question.

To the extent that it was appealed from, the judgment of the trial court is reversed and judgment is here rendered that appellees-plaintiffs in the trial court—take nothing and that they pay all costs in this behalf accrued. That portion of the trial court's judgment that deals with what was formerly claimed to be a vacancy opposite the Spears and the upper part of the lower McFarland is not before us for review and is not disturbed.